(No. 35474.—)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* CARL FIORITO, Plaintiff in Error.

*Opinion filed March 31, 1960—Rehearing denied May 16, 1960.*

CHARLES A. BELLOWS, and JASON ERNEST BELLOWS, both of Chicago, (SHERMAN C. MAGIDSON, of counsel,) for plaintiff in error.

GRENVILLE BEARDSLEY, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, Assistant Attorney General, and FRANCIS X. RILEY and JAMES R. THOMPSON, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE DAVIS delivered the opinion of the court:

Separate indictments, filed in the criminal court of Cook County, charged the defendant, Carl Fiorito, with the crimes of robbery and receiving stolen property. He waived jury trial and by stipulation the cases were consolidated for trial before the court. He was found not guilty of robbery, but was found guilty of receiving stolen property and was sentenced to the penitentiary for a term of not less than four nor more than six years.

Defendant urges that the trial court erred in its denial of a petition to suppress certain evidence and its refusal to quash a search warrant. He contends that his constitutional rights were violated when property was taken from his person at the time of his arrest and that the search warrant was issued without probable cause. Hearings were held before the court upon both of these questions prior to the trial of the case on the merits. Defendant testified at

the hearing on the petition to suppress evidence but not thereafter. The only evidence at the trial was adduced by the People. The facts were undisputed except as to what transpired at the time of defendant's arrest.

On August 21, 1958, Raymond Sunshine was the Chicago representative of Harry Winston, Inc., a diamond broker of New York City, with offices on the fifth floor of the building located at 55 E. Washington Street. At the time in question, six leather wallets containing diamonds of a value of more than $150,000, which were individually wrapped in paper, were in a vault on the premises and certain currency was also in a cash box.

Sunshine was alone in the offices at about 10:30 A.M. when a bell sounded indicating that someone had entered the reception room. He went to the outer office and saw a man clad in a blue uniform and cap who held a large package which almost completely covered his face. The man announced that he was a "mail man" and Sunshine opened a door to the inner office to admit him. Thereupon the man struck Sunshine over the head with a gun and proceeded to truss and bind him. He placed a small ball in Sunshine's mouth and used one inch adhesive tape to cover his face and head. The man then forcibly removed Sunshine's diamond ring in such manner that his finger bled. While these events were transpiring, Sunshine could hear noises and muffled conversation in the inner room where the vault was located. After the robbers had gone, Sunshine was released by his wife who had been in a nearby beauty shop. It was then discovered that all of the diamonds and wallets as well as the cash had been taken. The police were notified.

Joseph Tye, a sergeant in charge of the jewelry detail, arrived at the scene of the robbery when other officers, as well as agents Noonan and Ziel of the Federal Bureau of Investigation, herein referred to as the F.B.I., were already present. From investigation, Tye learned that the victim

had been bound with one-inch adhesive tape and that a man about 5 feet 6 inches tall of medium stocky build carrying a brown suitcase had been seen in the vicinity prior to and about the time of the crime. Tye reported these facts to his superiors including Joseph Morris, who was then acting deputy chief of detectives of the Chicago police department.

The testimony of Tye and Morris indicated that defendant was known to them; that he had been under their surveillance as one suspected of jewel thefts; and that the defendant fit the description of the man carrying the brown suitcase.

At about 3:00 o'clock P.M. on the date of the robbery, a man giving the name of Carl Perri appeared at the Commercial National Bank of Berwyn and inquired about renting a safety deposit box for a short period of time. He gave a Gary, Indiana, address and telephone number, both of which were fictitious. The vault clerk, who handled the transaction, testified that she saw the man place two black leather wallets in the box which was then rented to him. These wallets, as well as the diamonds they contained, were later identified at the trial by Sunshine as the property of Harry Winston, Inc., which was taken in the robbery. The defendant was positively identified by employees of the bank as the man who gave the name of Carl Perri, rented the box, and deposited the wallets.

From the testimony of William Meincke and Joseph Shea, agents of the F.B.I., it appeared that they were assigned by their superior, Marlin Moore, to question defendant concerning the robbery. At about 5:00 P.M., they were at the Parkway Hotel located at 2100 Lincoln Park West in the city of Chicago when defendant entered carrying a brown suitcase. Meincke stated that Shea was using the telephone when the defendant appeared and that he approached defendant, showed his credentials and advised him that there had been a diamond robbery about which

he desired to question him. Defendant said: "Fine." They then left the building and sat on an iron railing outside where Shea soon joined them.

There they had a conversation in which defendant denied any knowledge of the robbery and stated that he supposed they wanted to see what was in the suitcase. Meincke replied: "Not particularly," while defendant fumbled with the snaps on the suitcase, but was unable to open it. It was then decided that they could talk better in the agents' car which was parked nearby. When they entered the car, Meincke and defendant sat in the back seat and Shea in the front. Defendant again fumbled with the snaps on the suitcase and said, "Help me open it." At that point, according to Meincke, defendant shoved the bag toward Shea who reached out and tapped one of the snaps and the bag opened revealing the outer cover of a spool of one-inch adhesive tape. Meincke testified that he then asked defendant if he would mind going down to their office to talk further about the robbery and that defendant replied that he wouldn't object and said: "As a matter of fact, if you would have called me up on the telephone, I would have come down anyway."

Meincke further testified that, when they arrived at F.B.I. headquarters, the defendant voluntarily accompanied them to an interview room on the first floor of the building. There they conversed about the robbery, but defendant denied any implication. John C. Noonan, the agent who had helped investigate the robbery on the premises earlier in the day, was also present. He had learned that a man answering defendant's description had been seen carrying a brown suitcase in the vicinity of the robbery and communicated this fact to his superior, Marlin Moore, who, in turn, had ordered Meincke and Shea to question Fiorito.

Shortly before 7:00 P.M., when Noonan was in the interview room, the defendant asked if he was to be placed under arrest. Noonan told him that he would inquire and

let him know. Noonan testified that he left the room and returned shortly and told defendant he had "bad news" for him—that the Chicago police wanted him. Noonan then searched defendant and found a diamond ring in one of his socks, which was identified by Sunshine as the ring taken from his finger during the robbery. At the trial, a dried brown substance on the inside of the ring was proved to be human blood.

Before this search was made Marlin Moore had a telephone conversation with Joseph Morris of the Chicago police department in which Moore told Morris that defendant was in their interview room; and that he was about to be released since there was no Federal charge against him. In the course of the conversation Moore mentioned that the outer cover of a spool of adhesive tape had been found in a brown bag carried by defendant. Based upon information furnished by Tye earlier in the day relative to the brown bag and tape, Morris then told Moore to hold the defendant and stated: "We want him." The evidence further showed that Morris and Tye immediately went to the F.B.I. headquarters where defendant was placed in their custody.

On August 23, 1958, a warrant to search the safety deposit box at the Berwyn bank was issued by a justice of the peace of Cook County on a complaint signed by Sunshine, Meincke and two employees of the bank. Supporting affidavits were filed by three bank employees, Sunshine and Meincke. The warrant was executed by a constable who caused the lock on the box to be drilled. The contents were inventoried and a proper return was made. As already indicated, the wallets and diamonds produced from the box were identified at the trial as the property of Harry Winston, Inc., and received in evidence. The court also admitted the brown bag, spool cover and diamond ring taken from defendant's person.

Defendant's version of the events at the Parkway Hotel

differed materially from that of the officers. According to defendant, he was met there by four men, two of whom identified themselves as police officers and two whom he later learned were F.B.I. agents. One of the latter told him that there had been a robbery involving over half a million dollars and that they wanted to take him downtown to see their boss. Thereafter the agents put him in their car and took him to their offices and the policemen followed in another automobile.

Defendant stated that he was there questioned for the first two or three hours after arrival; and that he was then ordered to take off all of his clothes at which time the diamond ring was found in his sock.

He claimed that the ring belonged to him and that he had gotten it from someone at the race track a couple of weeks previously. He further testified that when the officers met him at the hotel, they neither served a warrant of arrest upon him nor showed him a search warrant. He denied that he had ever consented to a search of his person or effects; stated that the brown suitcase belonged to his wife; and denied any knowledge of its contents. He stated that when he entered the hotel he was about to pick up some laundry and had the bag with him for that purpose; that agent Meincke took this bag and opened it after they had entered the automobile; and that it was never returned to him.

On cross-examination defendant admitted that he had on previous occasions gone to the F.B.I. headquarters on request, but denied knowing either Meincke or Shea before the meeting at the Parkway Hotel. However, both Meincke and Noonan testified that they knew defendant, had seen him in their offices at previous times, and knew that he had been under surveillance for jewel thefts.

Neither the constitution of the United States nor that of this State forbids all searches and seizures. The prohibition is only against unreasonable searches and does not

extend to immunity from search upon a lawful arrest. (*Harris* v. *United States,* 331 U.S. 145, 150, 91 L. ed. 1399; *People* v. *La Bostrie,* 14 Ill.2d 617, 621; *People* v. *Clark,* 9 Ill.2d 400, 404.) An arrest without a warrant is lawful if a criminal offense has in fact been committed and the arresting officer has reasonable grounds for believing that the person to be arrested has committed it. (Ill. Rev. Stat. 1957, chap. 38, par. 657; *People* v. *La Bostrie,* 14 Ill.2d. 617, 621; *People* v. *Boozer,* 12 Ill.2d 184, 187; *Draper* v. *United States,* 358 U.S. 307, 3 L. ed. 2d 327.) Probable cause or reasonable grounds in such a situation means something less than the evidence which would result in conviction. *People* v. *Jones,* 16 Ill.2d 569, 573.

There is a great difference between that which is required to prove guilt in a criminal case and probable cause for arrest and search, as well as in the tribunals which determine such matters, and therefore, a like difference in the *quanta* and *modes* of proof required to establish such guilt or probable cause. (*Draper* v. *United States,* 358 U.S. 307, 3 L. ed. 2d 327; *Brinegar* v. *United States,* 338 U.S. 160, 93 L. ed. 1879.) Probable cause for arrest exists where the facts and circumstances within the arresting officer's knowledge and of which he had reasonable and trustworthy information are sufficient in themselves to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested is guilty. *People* v. *Jones,* 16 Ill.2d 569, 574; *People* v. *La Bostrie,* 14 Ill.2d 617, 622.

It is defendant's contention that he was arrested at the Parkway Hotel at a time when the officers had no reasonable grounds to believe that he had committed any offense; and that his arrest and the subsequent search of his person and seizure of his property were therefore illegal. The People, however, urge that defendant was not arrested until about 7:00 P.M.; that the arrest actually occurred in the F.B.I. offices after the officers were possessed of such in-

formation as to afford reasonable grounds for believing that defendant was implicated in the robbery and that the arrest and search incidental thereto were both lawfully made at that time. They further contend that the suitcase was opened with defendant's express consent and at his suggestion.

The evidence clearly indicates that defendant was not arrested at the hotel. While defendant's version relative to what occurred there differs from that given by the officers, there are certain undisputed facts and circumstances which justify the belief that the officers told the truth when they stated that they went to the hotel only to quesion the defendant; that they had no orders to arrest him and did not then arrest him; and that he voluntarily accompanied them to the F.B.I. offices to talk to them about the robbery. It is admitted that defendant had voluntarily appeared there for questioning on prior occasions when no arrest occurred. This circumstance lends credence to Meincke's testimony that defendant voluntarily agreed to come with them and stated: "As a matter of fact, if you would have called me up on the telephone, I would have come down anyway." The testimony of agent Noonan also supports the statements of Meincke and Shea as to what transpired at the hotel. Noonan testified that he and defendant were in the F.B.I. offices at about 7:00 P.M. when defendant asked if he was to be placed under arrest. Defendant did not deny that he asked this question. The inquiry indicated that defendant did not consider that he was then under arrest and that nothing had happened previously to induce such a belief.

There is also the undisputed testimony of Joseph Morris relative to his telephone conversation with Marlin Moore of the F.B.I. in which the latter stated that defendant was in the F.B.I. offices and was about to leave because they had no charge against him. The only reasonable conclusion from this evidence is that defendant's arrest did not occur

until after Morris requested Moore to hold him for the police department. It was apparently immediately thereafter that Noonan informed defendant that he had "bad news" for him in that the police department wanted him, and conducted the search of defendant's person which produced the ring.

There remains the question of whether, at the time of the arrest, the police officers and the F.B.I. were possessed of information which would induce belief in the mind of a reasonably cautious person that defendant was implicated in the robbery. There is no doubt that, prior to the arrest, both the police and agents of the F.B.I., knew that a robbery had been committed and that diamonds of great value had been stolen. While the police and Federal agents had conducted separate investigations, there were certain facts of common knowledge to both, especially after the telephone conversation between Morris and Moore. They then knew that a man resembling defendant had been seen outside the Winston offices some two weeks prior to the robbery and had been observed in the building on the day of the crime, carrying a brown suitcase.

The officers also knew that the victim of the robbery had been bound by Johnson & Johnson adhesive tape, one inch in width; that defendant was carrying a brown suitcase when first seen six hours after the robbery and that the outer cover of a spool of tape of the size and make found at the scene, for which defendant was unable to account, was discovered in the suitcase carried by him. In addition, defendant, who was known to both the police and Federal agents, had previously been under surveillance in connection with his suspected implication in jewel thefts and had voluntarily appeared for questioning.

A completely satisfactory determination of what constitutes reasonable cause for arrest by an officer without a warrant is difficult to formulate. The recurring question must be resolved by the facts and circumstances of each

case. In deciding the question in a particular case the courts deal with probabilities and are not disposed to be unduly technical. They must act upon "the factual and practical considerations of everyday life upon which reasonable and prudent men, not legal technicians, act." (*United States* v. *Rabinowitz,* 339 U.S. 56, 63, 94 L. ed. 653, 659; *Brinegar* v. *United States,* 338 U.S. 160, 175, 93 L. ed. 2d 1879, 1890; *People* v. *La Bostrie,* 14 Ill. 2d 617, 621, 622; *People* v. *Tillman,* 1 Ill.2d 525, 530.) In view of the facts known to the officers at the time, the arrest in the case at bar was lawful. It follows that the search of defendant's person and seizure of the ring were likewise legally justified. Since this evidence was obtained without violating the defendant's constitutional rights, he was not entitled to have it suppressed.

The testimony of the officers, if believed, established that the spool cover found in the suitcase was discovered with the consent of the accused. It was therefore admissible against him though obtained without a search warrant and though no warrant for his arrest had been issued at the time. (*People* v. *Mathews,* 406 Ill. 35; *People* v. *Preston,* 341 Ill. 407; *People* v. *Akers,* 327 Ill. 137.) In such cases where the evidence on the issue of consent is in conflict, this court will accept the finding of the trial court unless it is clearly unreasonable. (*People* v. *Peterson,* 17 Ill.2d 513; *People* v. *Mathews,* 406 Ill. 35; *People* v. *McDonald,* 365 Ill. 233.) The trial judge apparently believed the testimony of the officers on this question and we are not prepared to say that his conclusion is unreasonable.

The defendant argues that the search warrant was issued without probable cause because the affidavits filed in support of the complaint for the warrant failed to state facts from which a reasonable basis for the issuance of the warrant may be found. Particularly, defendant urged that none of the affidavits contain any statement from which it would be reasonable to infer that the property in the

box to be searched was the property taken in the robbery. We cannot agree.

Five affidavits were filed in support of the complaint. Collectively they state facts which established the commission of the robbery at 10:30 A.M. on August 21, 1958. They contained a detailed description of the diamonds and wallets then taken. They recited that on the afternoon of the same day the defendant Fiorito, giving the name "Carl Perri," rented a safety deposit box at the bank in Berwyn and placed therein black leather wallets of the same size, which was specified, as those taken in the robbery; and that no person other than Fiorito had access to this box.

It is true that none of the affidavits stated unequivocally, or as a conclusion, that the wallets placed in the box by Fiorito were actually those taken in the robbery. This was unnecessary. "If there is reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense charged, it is a sufficient basis for the issuance of a search warrant." *People* v. *Lavendowski,* 329 Ill. 223, 230.

A complaint for such a warrant is sufficient to authorize its issuance when the facts, stated and sworn to, show probable cause for the writ. It is not required that the complaint show, beyond a reasonable doubt, that the warrant should be issued. (*People* v. *Dolgin,* 415 Ill. 434, 441; *People* v. *DeGeovanni,* 326 Ill. 230, 234.) Here the fact that Fiorito, within five hours after the robbery, rented a deposit box under an assumed name and placed in it property, described as almost identical to that which was stolen, was in itself a circumstances sufficiently strong to induce the belief in the mind of a cautious person that he was implicated in the crime.

He urges that "wallets such as these, or similar thereto, are placed in safety deposit boxes every day." However, we believe that it may reasonably be said that such deposit

is rarely accompanied by circumstances showing the use of a false name, fictitious address and telephone number, and at a time and place coincidental with a $150,000 diamond robbery.

The existence of probable cause is a judicial question to be decided in the first instance by the magistrate before whom the complaint for a search warrant is made. (*People v. Dolgin,* 415 Ill. 434, 440.) That issue was properly resolved in this case by the magistrate and by the trial court which reviewed his action on the motion to quash the warrant. The affidavits, taken together, make a clear case of probable cause and the trial court's denial of the motion to quash the writ must be sustained.

The evidence of defendant's guilt is clear and convincing. He does not question the legal sufficiency of the proof. Since no reversible error occurred at the trial, the judgment of the criminal court of Cook County must be affirmed.

*Judgment affirmed.*