THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RALPH W. HORNAL, Defendant-Appellant.

(No. 74-172; )

Fifth District—June 9, 1975.

310

Paul Bradley and Eva Weisner, both of State Appellate Defender's Office, of Chicago, for appellant.

Robert H. Rice, State's Attorney, of Belleville (Bruce D. Irish and Robert J. Anderson, both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE EBERSPACHER delivered the opinion of the court:

This is an appeal by the defendant, Ralph W. Hornal, from a judgment of conviction entered by the circuit court of St. Clair County on a jury verdict of guilty to the charge of attempted burglary and the imposition of a $500 fine and a sentence which required the defendant to spend ten weekends in the county jail.

The defendant raises the following contentions on appeal. First, that "the trial court erred in denying the defendant's motion to suppress the identification and physical evidence where the line-up was held and the evidence seized as a direct result of the defendant's unlawful detention and the line-up procedure itself was unduly suggestive." Secondly, that "the trial court erred in denying defendant's motion for a directed verdict of acquittal where the evidence adduced by the state was insufficient to prove beyond a reasonable doubt the identity of the defendant as the perpetrator of the crime for which he was convicted." And lastly, that "the trial court erred in denying defendant's motion in limine and in permitting the state to present testimony relating to separate offenses where said testimony failed to conform to any of the exceptions to the general rule prohibiting its introduction at the defendant's trial upon an unrelated charge." In view of the defendant's contention that his detention was unlawful we find it necessary to review the testimony received by the trial court at the hearing on defendant's motion to suppress.

At this hearing the State called two witnesses. The first witness was

Patrolman Wilbert Jeremias. He testified that he was a police officer for East St. Louis. He stated that he learned over a radio broadcast that some subjects had just cashed a stolen check. The description given was four white males with long hair and one subject with bandages on his feet. Included was the description and license number of the car in which the subjects had departed. This was the only description of the subjects. Patrolman Jeremias was accompanied to the scene of the arrest by two Belleville police officers and two Washington Park police officers. The Belleville police had the name of the subject who had allegedly signed the check, Duke Gilliam. All of the officers proceeded to 1810 North 40th Street, the address written on the back of the endorsed check. The police asked the landlady's daughter who owned the Dodge station wagon parked out in front. The landlady's daughter answered that it might be Duke Gilliam's, one of the tenants who lived upstairs. At this point the only individual the police were looking for was Duke Gilliam. After receiving permission from the landlady's daughter, the police proceeded up the stairs to the only apartment on the second floor. There the police observed a door partially open. Through the opening the police observed a white male with bandages on his feet lying on a bed. It was too dark for the officers to observe anything else in the room. The police knocked on the door; when no one answered, they entered the apartment. No one granted the police permission to enter the apartment. The police had neither a search warrant nor a warrant for arrest of anyone in the apartment. Upon entering the apartment the police observed other individuals sleeping in adjacent rooms. All the occupants of the apartment were told to get up. The police asked Duke Gilliam to identify himself. Gilliam was not placed under arrest immediately. However, after a lapse of about 5 minutes Duke Gilliam and the other occupants of the apartment, including the defendant, were placed under arrest. Upon further examination Patrolman Jeremias stated that Gilliam stated that he owned the apartment. The police had not come to arrest anyone in the apartment other than Duke Gilliam. Upon being asked why the other occupants were arrested Jeremias responded, "Well, they fit the general description of the subjects supposed to have been with him; just long hair is all we had to go on." Long hair was the only reason the defendant was arrested. Once inside the apartment the police observed some brown substance in a plastic bag, which was believed to be marijuana, and a brown envelope with some white pills in it. Officer Jeremias did not charge the defendant with possession of these items. Officer Jeremias could not think of any reason why, with five police officers available, they could not have secured either an arrest warrant or a search warrant. On cross-examination by the State's attorney, Jeremias stated the reason they proceeded to Gilliam's

apartment was that the check contained the name and address of Duke Gilliam. The witness then affirmatively answered the following question, "Now, at the same time the Washington Park Police were looking for this same automobile with the same license number, because of an attempted burglary of the lady that we just had on the stand here, isn't that right?" The witness also affirmatively answered the question, "So, now, you had reason to believe that whoever stole that check could be found at this particular address that you went to, and whoever committed the attempted burglary would be found there because of the automobile?" The witness was then asked, "Also at that time Washington Park—Mr. Nelson—had a description of the two men who had committed this attempted burglary?" to which the witness responded, "Yes, sir." The State's attorney concluded this line of questioning by asking, "At that point you had reasonable grounds to believe that whoever committed the burglary cashed this check and stole the check and could be found at that location?" The witness answered, "That is correct." Upon being questioned by the police the defendant gave his address as 1810 North 40th Street, Gilliam's apartment. A *subsequent* check revealed that the defendant was issued the license plates on the Dodge station wagon. On redirect examination the witness stated that he did not have any information that any persons other than Duke Gilliam would be in Gilliam's apartment. The witness also repeated that the Dodge station wagon had been identified as Gilliam's car. He stated that Gilliam had cashed the check. The following colloquy then occurred:

"Q. Is it your testimony then that the reason the other two individuals were arrested at that time, and the reason they were charged with all of this was because they matched the general description of having long hair?

A. Right, sir.

Q. Officer, do you know what they were charged with as a result of this arrest?

A. Not from Belleville, I don't know.

Q. Were they charged with possession of things which were in the apartment?

A. I don't know; I didn't see any charges on it.

Q. Did you file any complaints?

A. No.

Q. Do you know which of the officers did?

A. Belleville and Washington Park; I think East St. Louis filed charges of possession——

\* \* \*

Q. Now, Officer, at the time did you have any description as to the height and weight other than for Mr. Gilliam?

A. No, sir, I don't believe so."

Except for the age of the landlady's daughter, approximately 50 years old, which was elicited on re-cross-examination this concluded Officer Jeremias' testimony.

The only other witness called was James A. Rokita, an officer in the Belleville Police Department. Officer Rokita explained the defendant's arrest as follows:

"Well, we have had a couple of house burglaries on the east end of Belleville, and we had information from the State Liquor Store in East St. Louis of a check that was——of Edward Florreich, which was just cashed at that store in the amount of forty something dollars * * *, and he obtained a description of three subjects that were in the store who cashed the check and obtained the license number of the car, and the description of the car; we had run the license number, but couldn't get the issue back from the Secretary of State's office at that time. The subject who cashed the check used an Illinois driver's license which was issued to Duke Gilliam."

Although the witness testified that the police did not at that time know who cashed the check, they did know that Duke Gilliam's identification had been used. After proceeding to 1810 North 40th Street the witness observed a vehicle matching the description of the vehicle described by the owner of the liquor store. At this point the witness summoned the Washington Park Police and the East St. Louis Police. In answer to the question why all these departments were called, the witness stated,

"We were not sure if this house was Washington Park or East St. Louis. Washington Park was closest, so we rode out to the Washington Park; they told us the address was in East St. Louis; Officer Nelson of the Washington Park Police Department accompanied us to 40th and Forest, where we met Officer Jeremias of East St. Louis."

After asking the landlady's daughter who owned the vehicle parked in front, they were given permission to go upstairs. There they observed, through the doorway, an individual with bandages on his feet lying on a bed. After knocking on the partially open door the police entered the apartment and took custody of Gilliam and two others, one of which was the defendant. Once in the apartment the witness observed that "there were items at that time that were described in our offense report of two burglaries we had in the east end of town." (One of the two

burglaries concerned that of the Mutto residence, which will be discussed later in this opinion.) After describing these items, the witness stated that the discovery of these items resulted in charges. The witness testified that Gilliam fit the description of the person who cashed the check. The witness then stated that he did not personally question the defendant about anything except that "we were all asking them if they owned this item or that item." The reason they did not get a warrant was they did not "feel it was necessary." Upon cross-examination the witness stated that they were pursuing a hot lead. The three men arrested were taken into custody because they fit the description given by the owner of the liquor store. The witness reasonably believed that these three individuals passed the check. The course of the investigation only took around an hour and a half. "All of the stuff" found was in "the immediate area of where all of these people were." The only description given by the owner of the liquor store other than a description which seemed to fit Gilliam was that one subject had a bad eye. The witness later stated that he observed that the third individual who was arrested in the apartment had a bad eye. The following colloquy then occurred,

"Q. Now, are you the officer who placed him [Mitchell] under arrest? Was there another officer?

A. No—Officer Jeremias.

Q. Officer Jeremias?

A. Yes.

Q. So, as far as Mr. Mitchell was concerned, who was the arresting officer?

A. Officer Jeremias.

Q. Who made the arrest of Mr.—

A. As far as any of them was concerned, Officer Jeremias was the arresting officer, we were under his jurisdiction.

Q. Did he made the arrest at your request?

A. Well, there was an offense committed in his city, in his jurisdiction—alleged forgery.

Q. All I am asking: He made the arrest on his own?

A. Right."

The State's attorney then asked the following questions;

"Q. Of course, you wanted them taken into custody?

A. Yes.

Q. So that he made the arrest on behalf of all of you for all the offenses that they had been suspected of?

A. Offenses were committed in Belleville, Washington Park, and East St. Louis were involved, and officers from—all three jurisdictions were present."

This concluded the testimony at the hearing on defendant's motion to suppress.

██ Section 107—2(c) of the Code of Criminal Procedure of 1963 provides: "A peace officer may arrest a person when: * * * (c) He has reasonable grounds to believe that the person is committing or has committed an offense." (Ill. Rev. Stat. 1971, ch. 38, par. 107—2(c).) Whether reasonable grounds, *i.e.*, probable cause, for an arrest exists in a particular case depends upon the totality of the facts and circumstances known to the officers when the arrest is made. (*People v. Clay*, 55 Ill.2d 501, 304 N.E.2d 280; *People v. Higgins*, 50 Ill.2d 221, 278 N.E.2d 68.) Furthermore:

> "In deciding the question of probable cause in a particular case the courts deal with probabilities and are not disposed to be unduly technical. These probabilities are the factual and practical considerations of everyday life on which reasonable men, not legal technicians, act. *Draper v. United States*, 358 U.S. 307, 3 L.Ed.2d 327, 79 S.Ct. 329; *People v. Fiorito*, 19 Ill.2d 246, 166 N.E.2d 606."

(*People v. Clay*, 55 Ill.2d 501, 504-505, 304 N.E.2d 280, 282.) The ultimate test, however, is whether an offense has been committed and the arresting officer has reasonable grounds to believe the person arrested has committed it. *People v. Doss*, 44 Ill.2d 541, 256 N.E.2d 753; *People v. Denham*, 41 Ill.2d 1, 241 N.E.2d 415; *People v. Lucus*, 41 Ill.2d 370, 243 N.E.2d 228.

An examination of the instant case requires that we determine precisely what knowledge was in the possession of the arresting officers: (1) a stolen check was cashed by a party who apparently fit the description of Duke Gilliam; (2) on the back of the check was Duke Gilliam's name and his address, 1810 North 40th Street; (3) the individual who cashed the check, allegedly Duke Gilliam, was accompanied by three white males with long hair; (4) the liquor store owner observed the vehicle in which the suspects departed and was able to give a description of it and its license number to the police; (5) the description of this vehicle matched the description of the vehicle observed by Mrs. Segech in the attempted burglary of her residence; (6) the defendant generally fit the description given the police by Mrs. Segech; (7) the police discovered the defendant sleeping in Duke Gilliam's apartment; and (8) the police discovered certain contraband and other incriminating evidence in Duke Gilliam's apartment.

While the police had access to all the foregoing facts and circumstances, it is less than clear upon which particular facts they predicated their arrest of the defendant. Neither officer testified that the defendant was arrested for the attempted burglary of the Segech residence, which is the

charge upon which the defendant was convicted in the instant case. Instead, each officer testified that the defendant was arrested because of his resemblance to the description given by the owner of the liquor store. In other words, the defendant was arrested because the arresting officers reasonably believed that the defendant had passed the stolen check at the liquor store. We are constrained to hold that this belief was unreasonable under the information available to such officers at the time of the defendant's arrest.

■■ Each officer testified that Duke Gilliam matched the description of the party who had passed the stolen check at the liquor store. Neither officer testified that the defendant passed the check or in any way actively participated in its passage. From the record before us we can only determine that three other persons, one of which might have been the defendant, were present at the time of the check's passage. The testimony at the hearing is void of any facts or circumstances upon which the arresting officers could have reasonably believed that either direct or accessorial liability could be assessed to the defendant for the passage of this stolen check. (See Ill. Rev. Stat. 1971, ch. 38, pars. 17—3, 5—2.) Thus, while the arresting officers had knowledge that an offense had been committed, they did not have sufficient facts from which to determine that the defendant committed it. Since the arrest was initiated on the basis of the passage of the stolen check it must be held to have been made without probable cause and, hence, it constituted an illegal arrest.

■■ The foregoing conclusion that the defendant's arrest was improperly made does not, ipso facto, vitiate the defendant's conviction. (*E.g., People v. Pettis*, 12 Ill.App.3d 123, 298 N.E.2d 372.) What is required is the general exclusion of evidence which was obtained as a result of this improper arrest. (*Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407.) The purpose of this exclusionary rule is to deter the lawless action of police. (*United States v. Calandra*, 414 U.S. 338, 38 L.Ed.2d 561, 94 S.Ct. 613; *Linkletter v. Walker*, 381 U.S. 618, 14 L.Ed. 2d 601, 85 S.Ct. 1731; *Mapp v. Ohio*, 367 U.S. 643, 6 L.Ed.2d 1081, 81 S.Ct. 1684.) The rule, however, should not be punitive nor extravagant in its application and to hold "that all evidence following an illegal arrest is ipso facto inadmissible would deprive law enforcement officers of not only the 'fruit of the poisonous tree,' but, to extend the metaphor, the wood, the leaves and even the shade as well." *In re Lamb*, 21 Ill.App.3d 827, 832, 316 N.E.2d 42, 46.

■■ The Supreme Court has held that the exclusionary rule has no application when the government learned of the evidence "from an independent source." (*Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 64 L.Ed. 319, 40 S.Ct. 182.) The Supreme Court reaffirmed the

independent source exception to the exclusionary rule in *Nardone v. United States*, 308 U.S. 338, 341, 84 L.Ed. 307, 60 S.Ct. 266, wherein it stated, "the facts improperly obtained do not 'become sacred and inaccessible. * * *'" provided knowledge of them is gained from an independent source. A second exception to the exclusionary rule was engrafted by the Supreme Court in *Nardone*. Of this exception the Supreme Court stated, "As a matter of good sense, however, such connection (between illicit wire-tapping and the government's proof) may have become so *attenuated* as to dissipate the taint." (Emphasis added.) (308 U.S. 338, 341.) Both the *attenuated basis* and the *independent source* exceptions were reaffirmed in *Wong Sun v. United States*, 371 U.S. 471, 9 L.Ed.2d 441, 83 S.Ct. 407. It then added a third dimension, sometimes referred to as the *inevitability* exception, when it stated:

> "We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.' Maguire, Evidence of Guilt, 221 (1959)." (371 U.S. 487-488.)

These exceptions are well summarized in *United States ex rel. Owens v. Twomey* (7th Cir. 1974), 508 F.2d 858, 865, wherein the court stated,

> "* * * there have evolved three tests from *Wong Sun*, any one of which, when applicable, establishes that the controverted evidence is not the fruit of the poisonous tree when: (1) the evidence was discovered by an independent source; (2) the evidence is sufficiently distant in causal connection from the illegal search and seizure so that the connection has become so attenuated as to dissipate the taint; or (3) the evidence inevitably would have been gained even without the unlawful search."

■■ Applying these three tests to the instant case, we conclude that the exclusionary rule requires the exclusion of all testimony relating to the defendant's pretrial line-up; however, it does not require the exclusion of the victim's subsequent in-court identification of the defendant. The defendant was placed in this line-up while he was incarcerated as a direct result of his illegal arrest and but for the illegal actions of the police the defendant would not have been in custody. Hence, all testimony relating to the defendant's pretrial line-up should have been suppressed. (See *People v. Bean*, 121 Ill.App.2d 332, 257 N.E.2d 562.) Conversely, the record before us demonstrates that the victim's subsequent in-court identification is outside the perimeters of the exclusionary rule.

■■ In the instant case the victim of the crime, Mrs. Segech, gave the police a general description of her assailants. Furthermore, she gave to the police the description of the vehicle in which her assailants fled and, more importantly, the license number of such vehicle. While it was unknown to the arresting officers at the time of the defendant's arrest, this license number was issued to the defendant. This information was not obtained as a result of the defendant's illegal arrest. Likewise, the discovery of the defendant together with codefendant Mitchell in Duke Gilliam's apartment was independent of the defendant's illegal arrest since the foregoing review reveals that the police had probable cause to arrest Gilliam and, consequently, to determine the identity of those individuals found sleeping in the adjacent rooms. On the basis of the above facts and circumstances, discovered independent of defendant's illegal arrest, the police would have had probable cause to arrest the defendant for the attempted burglary of the Segech residence.

■■ Under these circumstances the crucial question continues to be whether Mrs. Segech's in-court identification was sufficiently purged from the illegality of the defendant's arrest. The line-up was conducted on April 12, 1973, 3 days after the attempted burglary. The trial commenced July 24, 1973. While the mere passage of time is insufficient to free a subsequent identification of the taint of an illegal arrest (*People v. Bean*, 121 Ill.App.2d 332, 257 N.E.2d 562), we believe that the instant record demonstrates that the in-court identification of the defendant was purged of the primary taint of illegality. The witness testified that the defendant was only 5 or 6 feet from her at the time of the attempted burglary, that the break-in occurred at 2:30 P.M. on April 9, 1973, and that the defendant remained in her house for a few minutes before leaving with codefendant Mitchell. The witness was able to give the police a general description of the defendant. The witness then testified that the white male with shoulder-length dark hair who entered her house on the day in question was the defendant. The witness positively identified the defendant prior to any questions relating to her line-up identification of the defendant. In other words, all references to the line-up occurred subsequent to the witness' in-court identification. Under these circumstances, we conclude that the witness' in-court identification testimony was not acquired by exploiting the defendant's illegal arrest, that it was removed from the primary taint of illegality, and that such testimony was properly admitted. See *People v. Triplett*, 46 Ill.2d 109, 263 N.E.2d 24; *People v. McDonald*, 23 Ill.App.3d 86, 318 N.E.2d 489.

■■ The next issue to be resolved is whether the trial court erred in admitting evidence relating to another burglary, that of the Mutto residence. While the rules concerning the admission of evidence relating to

crimes other than the one for which the defendant is presently being tried are well settled, the application of such rules is not as readily apparent. We start with the general rule—evidence of separate offenses unconnected with the crime for which the defendant is on trial is incompetent. (*E.g., People v. Harris*, 46 Ill.2d 395, 263 N.E.2d 35.) This rule is tempered by the fact that such evidence is admissible provided it is limited to evidence which has a tendency to disprove the defendant's alibi (*People v. Harris*, 46 Ill.2d 395, 263 N.E.2d 35), which has a tendency to prove the absence of mistake (*People v. Dewey*, 42 Ill.2d 148, 246 N.E.2d 232), or which establishes motive, intent, knowledge, identity, common scheme or design, or other facts material to the issue on trial (*People v. Jordan*, 18 Ill.App.3d 133, 309 N.E.2d 274). While these exceptions may, at times, seem to nullify the general exclusionary rule, they are, of course, subject to the requirements of relevancy and materiality (see *People v. Bassett*, 56 Ill.2d 285, 307 N.E.2d 359). And, ultimately, the issue becomes whether the probative value of such evidence outweighs its prejudicial effect upon the defendant. *United States v. Farns* (7th Cir. 1974), 501 F.2d 486; *United States ex rel. Harris v. State of Illinois* (7th Cir. 1972), 457 F.2d 191, *cert. denied*, 409 U.S. 860.

■■ While we would not have been inclined to reverse this case solely on the basis of the trial court's discretionary admission of evidence relating to the Mutto burglary, we do believe the better approach would have been to exclude such evidence. In reaching this conclusion we are not unmindful of the requirement that the State prove, beyond a reasonable doubt, each element of an offense, that one of the elements of the offense of burglary (and, attempted burglary) is the intent to commit a theft (Ill. Rev. Stat. 1973, ch. 38, par. 19—1), and that circumstantial evidence, *i.e.*, similar conduct, may be utilized to fulfill this burden. Nevertheless, the evidence and testimony relating to the Mutto burglary injected into the defendant's trial a collateral issue of major proportion. That issue was whether such evidence was sufficient to establish that defendant committed the Mutto burglary. The jury had to affirmatively resolve this issue before such evidence had any probative value with respect to the instant proceedings. The circumstantial evidence surrounding the Mutto burglary was, in our opinion, far from conclusive. On the other hand, the prejudicial nature of such evidence was great. Consequently, from our review of the record we find that the minor probative value of such evidence was outweighed by its prejudicial tendencies and, hence, such evidence should not have been admitted.

In view of our conclusion that all evidence relating to the Mutto burglary should have been excluded, we need not reach the defendant's contention that the evidence recovered from Gilliam's apartment should

have been suppressed. Hence, the defendant's sole remaining contention is that the State failed to prove the defendant guilty beyond a reasonable doubt.

■■■■ The main thrust of the defendant's contention is that the identification testimony by Mrs. Segech was unreliable. We do not agree; the determination of the witnesses' credibility is inherently the function of the trier of fact. It was the province of the jury to determine whether they wished to accept the defendant's testimony or the testimony of Mrs. Segech. (*People v. Pagen*, 52 Ill.2d 525, 288 N.E.2d 102.) The jury was confronted with Mrs. Segech's original description to the police which was at variance with her subsequent identification of the defendant. The principal claim of the defendant is that Mrs. Segech originally reported that he had some facial hair when, in fact, he did not. In *People v. Catlett*, 48 Ill.2d 56, 268 N.E.2d 378, our supreme court stated that precise accuracy in describing facial characteristics is unnecessary where an identification is positive. (See also *People v. Rogers*, 23 Ill.App.3d 115, 318 N.E.2d 715.) The failure of a witness to report the presence or the absence of a mustache, or other facial features is solely a question of weight to be afforded the witness' identification. (*People v. Arroyo*, 18 Ill.App.3d 187, 309 N.E.2d 804.) In the instant case the witness had an ample opportunity to observe the intruders, in fact, she saw them get out of their car before they entered her house. Her identification was positive, and despite the fact that she was somewhat hysterical, she was able to observe and write down the license number of the automobile in which the intruders fled. We find this evidence of the witness' opportunity to observe her assailants and her positive identification of the defendant sufficient to support his conviction. See *People v. Rogers*, 23 Ill.App.3d 115, 318 N.E.2d 715.

■■ While we believe the testimony of Mrs. Segech was sufficient to sustain the defendant's conviction, we cannot say that the improperly admitted line-up identification, which was obtained as a direct result of the defendant's illegal arrest, was a harmless error. Consequently, we believe justice would best be served in a new trial free from the irregularities to which we have made reference. We, therefore, remand this cause for a new trial to be conducted in a manner consistent with the views herein expressed.

Reversed and remanded with directions.

JONES, P. J., and G. MORAN, J., concur.