THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.*
MICHAEL NOLAN, Defendant-Appellee.

First District (2nd Division)   No. 77-371

Opinion filed April 11, 1978.

Bernard Carey, State's Attorney, of Chicago (Timothy Quinn, Assistant State's Attorney, of counsel), for the People.

No appearance for appellee.

Mr. JUSTICE DOWNING delivered the opinion of the court:

The State appeals from an order of the trial court granting defendant's motions to suppress a statement and certain physical evidence unlawfully seized by the Chicago police. The issue on appeal is whether the trial court's findings of fact and conclusions of law were manifestly erroneous.

The relevant facts established at the lengthy hearing on the motions are that on November 21, 1974, the slain body of Julie Oswald was found near Bogan High School in Chicago. Defendant, Julie's boyfriend, was arrested and subsequently indicted for her murder.

Chicago police investigator Thomas Quinn testified that on November 21, 1974, he was assigned to Area Three Homicide. Quinn and his partner, Investigator John Solecki, were assigned to investigate the Oswald homicide. At the location where the body was found, Quinn obtained a description of a man seen leaving the scene from Mrs. May Karavides, an elderly woman who spoke English through an interpreter, and from other police officers at the scene. That description was of a male white, approximately five feet 10 inches tall, thin build, long blond hair, dark clothing, carrying a dark object, dark pants, and shoes.

At 7 p.m. that evening, Quinn saw defendant at Holy Cross Hospital with decedent's mother and sister. Quinn was informed by another police officer that defendant was decedent's boyfriend. Quinn then spoke with defendant for approximately 30 to 45 minutes. He asked if defendant had seen decedent earlier that day. Defendant replied that he had last seen her that morning, as she boarded a bus at 79th Street and Pulaski to go to work. Quinn did not inform defendant that he was a suspect in the murder, nor did he or anyone else then advise defendant of his rights. According to Quinn, defendant was free to leave the room at this time. Following their conversation, Quinn asked defendant to accompany his

partner and him back to Area Three. Quinn informed defendant he was the last person to see decedent alive and asked him to cooperate in the investigation. Defendant said he was glad to help.

Quinn and Solecki then drove defendant to Area Three. Defendant rode in the back of the car, alone. He was not handcuffed. When they arrived at Area Three, they informed defendant that because he was the last person to see decedent alive, he could become a prime suspect in the murder. Solecki then informed defendant of his rights.

Quinn testified that defendant was questioned in an interview room at the police station beginning at approximately 7:30 p.m. At this time defendant was still free to leave. At 9 p.m., however, some conflicts developed in defendant's story as to his whereabouts at the time of the murder. At the hospital, defendant had told Quinn and Solecki that he had met decedent while shopping alone in a bookstore at Ford City, and that he had never gone farther west than Karlov Street. Defendant's second story was that he was with decedent and one Vince Navarro in a bookstore at 79th and Pulaski. Later, he said that he had gone further west than the east side of Karlov Street. Defendant was placed under arrest at 9 p.m.

At approximately 10:30 p.m., Quinn took defendant to Area One homicide for a lineup. The lineup was to be held at Area One because there was no one-way mirror in the lineup room at Area Three, and because the witnesses who were to view the lineup were an elderly woman and two very young girls. Defendant was not handcuffed during the ride to Area One. The five-man lineup was viewed by Mrs. Karavides and by Gail and Cheryl Mitchell. No identification was made.

After the lineup, defendant was taken to the 8th Police District, the area in which the homicide occurred. There defendant was fingerprinted, processed, and photographed. Defendant was handcuffed during the ride from Area One to the 8th District because, in Quinn's words, defendant was then under arrest for "investigation of murder."

During one of the car trips, Quinn testified that defendant asked to speak to a friend of his, a priest. Quinn told him it would be all right, but that the priest was probably in bed by that time. Defendant did not at any time ask for an attorney.

Quinn testified that by 1:30 a.m., the police had contacted Vince Navarro who denied having been with defendant that morning. Defendant was confronted with Navarro's denial. He then indicated he would tell still another story.

Elizabeth Nolan, defendant's mother, testified next that she saw police cars outside of the Oswald home at 5:15 p.m. on November 21, 1974, as she returned from a shopping trip. She sent defendant there to find out what was happening. Between 6:15 and 6:30 p.m., her son and his friend

Michael Cusane returned. Defendant was crying and screaming that someone had killed his girl friend. He then returned to the Oswald's because he said the police wanted to talk to him.

Mrs. Nolan testified that at approximately 7 p.m., four police officers in civilian clothes knocked at her back door. One man showed an identification card and said they were police officers. At the same time, four more police officers knocked at the front door and were admitted. Mrs. Nolan testified that the last four left when they discovered the first four officers were in the house. Mr. Nolan was also present. No search warrant was shown to Mrs. Nolan. She told the officers that she had not seen defendant leave the house that morning, but that she first saw him shortly after 1 p.m., when he returned home to change clothes. When he came in he was wearing dark pants, a dark blue corduroy jacket, and black shoes. One police officer asked to see the clothes and she said "yes." Mrs. Nolan took the officers into defendant's room and retrieved the clothing for them. She could not remember which shirt her son had worn that morning, but found none missing from the closet. One of the police officers accompanied her into the bathroom where she dumped out a clothes hamper. None of defendant's shirts were in the hamper. When they left, the police ook the slacks, shoes, and jacket, as well as a light blue denim jacket and some sweatshirts.

Mrs. Nolan asked the police to take her to the police station with them so that she could see her son. One of the officers gave a business card with an address and telephone number to Mr. Nolan so that he would know where his wife was. The officer assured Mr. Nolan that his wife would be escorted home. Mrs. Nolan arrived at Area Three about 8:15 p.m. She did not see her son for five hours. While she waited she spoke with Investigator Rochowicz. Rochowicz asked Mrs. Nolan if her son used drugs or alcohol and if he had ever been to a psychiatrist. He told her, "I think you have a sick son on your hands." He told her that her son had been involved in a quarrel in a restaurant and that there was a witness who had given this information to the police. He also told her that an elderly woman in a wheelchair who did not speak English, had seen her son throw the body over a fence. Mrs. Nolan asked repeatedly to see her son. Each time she was told she could not. Rochowicz suggested that she go home, but she insisted on remaining until she saw her son. Finally, she was allowed to see him shortly after 1 a.m. on November 22. Just before she entered the room where her son was being held, she asked Rochowicz what she could say to her son. "He said, 'Everything what I told you and what you saw you can tell your son now.'" When she entered the room where defendant was being held, he yelled, "Ma, go. Get me a lawyer," three times. She responded, "You will listen to me now. I want to hear from you, and I got a lot to tell you. Now, tell me where you was mitt [*sic*]

Julie, where you left her." He told her he had met Julie in Barnaby's, but there had been no quarrel. He had had only one beer. Then she said, "Look, there is a eye-witness, an elderly lady saw you throwing her body over the fence." He replied that the police had lied to her. She responded, "The police cannot lie. They stated to me they have two witnesses and one eye-witness, and once in your life, tell me the truth. Are you on dope? And maybe you're sick and I don't know." He denied that. She then said, "Maybe you don't know what you're doing when you were out or drink all over, like Mr. Rockowitz [*sic*] explained me, and take dope. You don't know what can happen." She repeated this line of questioning a second and a third time. Finally, her son said, "Ma, go home, ask Mr. Bogden. You believe them." He told her that Mr. Bogden had seen Julie and him near a public library. She said, "What are you doing in the library? Since when you go library?" He said that he and Julie had said good-bye in front of the library, and then she got on a bus to go to work. He went into the library to use the bathroom. Then Mrs. Nolan got up and said, "Only God can help you." She then walked out of the room.

Mrs. Nolan testified that she looked at her son's hands during the conversation because he was sketching out his whereabouts with his hands on the table. She saw that they were smeared with what appeared to be ink, but she saw no cuts on his hands. When she turned away from her son, Rochowicz was standing in the doorway. She then had the following conversation with him:

> "He asked me, 'What did you son told you?' I said, 'My son was lying to me, and you have two witnesses and an eye-witness. You here me from a lawyer.' He said, 'Do you have a lawyer?' I said, 'No. Do you have one in the house?' He said, 'No. They're also very expensive.' I say, 'Oh, my God.' He said then, 'Don't worry about that, he will get Public Defender.' I say, 'What are those?' He said, 'They're appointed from the State, and that's all you can do. Go home now.' "

Mrs. Nolan then went home.

Assistant state's attorney James Klein testified that he arrived at Area Three at approximately 2 a.m. on November 22, 1974. He advised defendant of his rights. A court reporter did not arrive until approximately 3 a.m. Defendant was again advised of his rights. Defendant made no statement to Klein that he was being coerced or tricked into making a statement by the police, or that he wanted a lawyer.

Defendant testified that he arrived at the Oswald residence at 6:15 that night and spoke with decedent's sister and Officer Rochowicz. He was told that Julie had been killed. He told the police he wanted to go home to tell his mother, but Rochowicz told him not to leave because he was the last person seen with decedent and he would have to go for a lineup and

questioning. Defendant left the Oswald's anyway, with Michael Cusane, and went home. He told his parents what had happened and that he had to go back to the Oswald's because the police wanted to question him. He returned to the Oswald's and accompanied Mrs. Oswald to Holy Cross Hospital. He had been at home less than five minutes.

At the hospital, some plainclothes police officers pulled him into a corridor and told him to sit down. Then they took him to an interview room. Investigator Solecki asked him if he knew about murder, manslaughter, and involuntary manslaughter. Defendant replied that he knew about murder, but did not know about voluntary and involuntary manslaughter. Solecki told defendant he had to go down to Area Three Homicide with them. Defendant said he wanted to stay at the hospital with Mrs. Oswald, but Solecki told him he could not stay there. He was at the hospital a total of less than 15 minutes.

Defendant left the hospital with Solecki, Quinn, and one other police officer. As he walked out of the hospital, there were "two police officers on the side of me, one in front, and a bunch in back." They paused for a moment before a man with a camera. He was taken to Area Three in an unmarked police car. Defendant was handcuffed behind his back at this time. At Area Three he was placed in a room. His handcuffs were removed. Then he was questioned by Solecki, Quinn, Officer Kunz, and various other police officers, numbering 15 in all. He was never told that he was being charged with anything. Solecki told him that he "did the crime" and that there were three eyewitnesses. He was questioned until 8:30 or 8:45, when he asked for an attorney because he didn't want to talk anymore. The police officers then called him a "jackoff," said that he was the boyfriend, and that he was guilty. Solecki grabbed him, threw him against the wall, and began to curse him. He called defendant an "asshole" and accused him of lying because his jugular veins and the veins on his forehead were coming out. At this point, defendant again asked for an attorney. He was told, "No way." After Solecki left, defendant again asked Quinn for a lawyer. Then Quinn left, and two more officers came in and asked him questions. He also told these men he wanted an attorney. After a while, these officers left the room, and three more came in and "that's how it kept going all night."

Between 10 and 11 p.m., he was taken to Area One for the lineup. He was asked to change into the clothing the police had taken from his home. After the lineup, Kunz told him that he had been identified by the three witnesses, and that only he (Kunz) could help defendant now. Kunz said it would help if he confessed. He refused because he had done nothing wrong. Kunz then said, "Well, there's nothing more I can do. I'm going to let Officer Solecki come in here and you know how he is." Solecki then

came into the room, again called defendant a "jackoff," pulled him from the chair in which he was sitting, and threw him against a wall.

Defendant testified that he was then taken to the 8th District police headquarters. Quinn took out an "arrest sheet" and told defendant that if he confessed, the charge would not be murder, but manslaughter or involuntary manslaughter. He again refused to confess. Quinn said that if he confessed, the charge would be manslaughter and he would get a padded cell with a television and a rug. Quinn then asked him if he had ever been in a bullpen. He said no. Quinn then said, "Well, there is 50 to 100 blacks in there and they like little white boys." Defendant then asked to speak to his friend, Father Griffin. Quinn told him the priest would be asleep, and that if he had heard what was going on, he would have come down. Quinn refused to call Father Griffin.

They returned to Area Three for more questioning. Finally, he was allowed to speak to his mother. Defendant's account of his conversation with his mother corroborates her account. After his mother left, Quinn, Solecki, and Kunz came in and again asked him if he wanted to confess. He refused, and they left the room. Kunz came back in and told him that he would be charged with the murder because he was the boyfriend, and "the jury would find him guilty anyway." Then Kunz suggested what he could say:

"Q. What did he tell you you could say?

A. If I—he asked me if I ever had sexual relations and things of that nature and then he said that if I said something like, I went over a fence with Julie Oswald and we were climbing over that and she fell and struck her head and I panicked and ran, a jury would see that it was panic and nothing could be done and I just ran, within a month, I would be out of jail. Otherwise, I was going to prison."

Kunz reviewed this story with defendant for 15 minutes. He then left the room to speak with the other officers. Then Quinn, Solecki, Kunz, and two other police officers came in. Quinn asked if he was now ready to give a statement. They then left the room as defendant and Kunz went over the statement he would give one more time. He then related the statement to the assistant state's attorney as Kunz had instructed him.

Defendant testified that he was not given Miranda warnings until 2:30 a.m., when the assistant state's attorney took his statement. He maintained that he did not understand those rights.

With regard to the motion to suppress physical evidence, defendant testified that he paid $20 per week to his parents as rent for his room, until he had been laid off of his job. He testified the house was a single-family, one-story residence with four bedrooms; that he had one of the

bedrooms; that his parents had access to his room; that his mother did his laundry; and that he never told his parents to keep other people out of the room. He did not consent to the search of his room by the police.

Investigator Solecki testified that he advised defendant of his rights at 7:30 p.m. He denied striking defendant or any other mistreatment. He denied that defendant had ever asked for an attorney; that he had asked defendant if he knew about murder, manslaughter, and involuntary manslaughter; and that defendant was handcuffed during the ride from the hospital to Area Three. He advised defendant of his rights upon their arrival at Area Three because he knew that defendant was the last person to see decedent alive and he felt, as an experienced police officer, it was advisable to do so.

John Herman, another police investigator assigned to Area Three, testified that he went to the Nolan home with Investigator Rochowicz at approximately 6:30 p.m. on November 21, 1974. They were admitted to the house by Mrs. Nolan after they identified themselves as police officers. He testified that Mrs. Nolan was very cooperative in locating the clothing. At the time they entered the house, the officers had a description of the clothing worn by the individual seen leaving the location where the body was found. The clothing seized fit that description. They did not know at that time whether or not defendant was under arrest.

Investigator Kunz testified that he had a brief conversation with defendant in an interview room at Area Three, during which he informed defendant of his rights. Kunz then left the room and did not again see defendant until after he had given his statement. Kunz denied promising defendant leniency, striking him, or having seen any other police officer strike defendant. He never suggested to defendant that he give a statement that decedent's death was an accident.

Following the hearing, the trial judge suppressed the statement as the fruit of an unlawful arrest and the clothing as the product of an unlawful search. The court made the following findings of fact: (1) Defendant's arrest took place at the hospital at 7 p.m. on November 21, 1974. (2) At that time the police lacked probable cause to make an arrest. The detention of the defendant was purely investigatory and led to the statement. (3) There was no break in the causal connection between the unlawful arrest and the statement. (4) Defendant's mother did not consent to the search of her son's room. The court characterized Mrs. Nolan as a "highly nervous, law-abiding, unsophisticated woman who has a unique attitude toward police officers," who merely acceded to the demands of the police to search her son's room.

## I.

■■ Defendant, the appellee, has not filed a brief in this court. Under *First Capitol Mortgage Corp. v. Talandis Construction Corp.* (1976), 63

Ill. 2d 128, 345 N.E.2d 493, the court has its choice of three actions: we may consider the merits of the appeal; we may search the record for reasons to affirm the judgment of the trial court; and, we may reverse the judgment of the trial court if the appellant's brief demonstrates *prima facie* reversible error, and the contents of the brief find support in the record. Because of the fundamental nature of the issues raised by this record, and because in our opinion the State's brief fails to present a case of *prima facie* reversible error, we shall consider the merits of the appeal.

## II.

### Motion to Suppress Statement

The State contends that the trial court's findings of fact and conclusions of law are manifestly erroneous, and that the evidence conclusively established that defendant was not arrested until 9 p.m., after he had given the police conflicting reports as to his whereabouts at the time of the murder.

■■ A police officer may arrest a person when he has reasonable grounds to believe that the person is committing or has committed an offense. (Ill. Rev. Stat. 1975, ch. 38, par. 107—2(c).) "Reasonable grounds" has the same substantive meaning as "probable cause." (*People v. Wright* (1974), 56 Ill. 2d 523, 528, 309 N.E.2d 537; *People v. Lawson* (1st Dist. 1976), 36 Ill. App. 3d 767, 770, 345 N.E.2d 41.) The test is whether a reasonable and prudent man, having the knowledge possessed by the officer at the time of the arrest, would believe a person committed an offense. The trial courts should not apply the test of sufficient evidence to convict, must deal with probabilities, and are not disposed to be unduly technical. *People v. Clay* (1973), 55 Ill. 2d 501, 504-05, 304 N.E.2d 280.

The elements of a valid arrest are present when the police inform the defendant of a violation, he submits to their control, and when the evidence clearly shows that the officers intend to effect an arrest and that the defendant understood them. See *People v. Wipfler* (1977), 68 Ill. 2d 158, 165, 368 N.E.2d 870, and cases cited therein.

Our review of the record leads to the conclusion that whether there was probable cause to arrest defendant for the murder of Julie Oswald at the hospital at 7 p.m., and whether the elements of a valid arrest were then present depends on whether the evidence presented by the defendant is believed, or whether the evidence presented by the State is believed. The State contends that at 7 p.m., the police knew that defendant was a close friend of the decedent; that he had been with her prior to her death; that he was the last known person to see her alive; that he fit the general description of the person seen leaving the location where the body was found; that the victim's body was found near a jagged piece of red-stained concrete; and, that defendant had scrape marks, a blister, and a

clean band-aid on his right hand. However, as was the case with all of the evidence at the hearing, the evidence as to the scrape marks, blister, and band-aid was in sharp conflict. Mrs. Nolan testified that she saw no such marks on her son's hands. Officer Quinn testified that he saw the marks, and that a band-aid was visible on defendant's hand in the photograph of the lineup, but admitted that the marks did not appear in another photograph of defendant's hands taken that night.

In juxtaposition, the defendant's evidence was that he was taken aside by the police officers nearly immediately after his arrival at the hospital, asked if he knew about murder, manslaughter, and involuntary manslaughter; told that he had to accompany them to Area Three Homicide and that he could not remain with Mrs. Oswald at the hospital; led out of the hospital surrounded by police officers; handcuffed; and driven away in a police car.

■■  The trial judge was in a far better position than we to judge the credibility of the witnesses and their demeanor on the witness stand. (See *People v. Rogers* (5th Dist. 1975), 25 Ill. App. 3d 7, 11, 322 N.E.2d 563.) He was obviously impressed with the credibility of the defendant's witnesses, and expressly stated that he found the testimony of the police officers "less than credible." We would be reluctant to substitute our judgment for his. Given the facts as he saw them, the court's conclusion that defendant was arrested for purely investigative purposes was a reasonable inference to be drawn. This conclusion is not manifestly erroneous. (See *People v. Clay* (1973), 55 Ill. 2d 501, 505, 304 N.E.2d 280.) The trial court found that the statement of the defendant was made in violation of his Fourth Amendment rights and should be "suppressed under the unlawful arrest theory"; and that the statement could not be considered as a "free and voluntary act" of the defendant because of the "actions of the police department in this matter." The court's action in ordering the suppression of the statement was correct. *Wong Sun v. United States* (1963), 371 U.S. 471, 9 L. Ed. 2d 441, 83 S. Ct. 407; *People v. Wilson* (1975), 60 Ill. 2d 235, 326 N.E.2d 378; *People v. Hornal* (5th Dist. (1975), 29 Ill. App. 3d 308, 315-18, 330 N.E.2d 225; see also *Brown v. Illinois* (1975), 422 U.S. 590, 598-600, 45 L. Ed. 2d 416, 95 S. Ct. 2254.

■■  The State also takes issue with the trial court's finding that the statement was the result of coercive police tactics. The court found that the defendant, then age 19, was placed in custody for a period of eight hours, subjected to interrogation repeatedly and by numerous police officers, moved around the city, placed in a lineup at which none of the witnesses identified him, lied to, frightened, and psychologically abused. The court also found that defendant's mother was prevented from seeing him, lied to, and turned into a tool for the police to break him down. The

State contends these findings are also manifestly erroneous. The State bases its argument solely on the evidence it presented at the hearing, which, as we have noted, was in substantial conflict with that presented by the defendant. The issue here is also the credibility of the witnesses. It is clear that the record contains sufficient evidence of these abuses, if believed by the trier of fact, to sustain the conclusions reached. The findings and conclusions of the trial court on the issue of voluntariness are not manifestly erroneous.

For the reasons stated, that portion of the trial court's order which suppressed the statement given by the defendant to the police is therefore affirmed.

## III.

### *Motion to Suppress Physical Evidence*

The State next contends that the trial court's conclusion that Mrs. Nolan did not consent to the search of defendant's bedroom is without support in the record, and that the court's order suppressing the clothing removed from defendant's bedroom should therefore be reversed.

■■ When the prosecution seeks to justify a warrantless search by proof of voluntary consent, it is not limited to proof that consent was given by the defendant, but may show that permission was obtained from a third party who possessed common authority over, or other sufficient relationship to, the premises or effects sought to be inspected. (*United States v. Matlock* (1974), 415 U.S. 164, 171, 39 L. Ed. 2d 242, 249-50, 94 S. Ct. 988, 993; *People v. Stacey* (1974), 58 Ill. 2d 83, 87-88, 317 N.E.2d 24; *People v. Johnson* (1st Dist. 1974), 23 Ill. App. 3d 886, 891, 321 N.E.2d 38.) The authority which justifies third-party consent does not rest upon the law of property, but rests rather on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right, and that the others have assumed the risk that one of their number might permit the common area to be searched. (*Matlock,* 415 U.S. 164, 171 n. 7, 39 L. Ed. 2d 242, 250 n. 7, 94 S. Ct. 988, 993 n.7; *Stacey,* 58 Ill. 2d 83, 88.) The question of whether consent has been given is a factual matter to be initially determined by the trial court, and where the evidence on the issue is in conflict, this court will accept the finding below unless it is clearly unreasonable. *People v. Haskell* (1968), 41 Ill. 2d 25, 30, 241 N.E.2d 430.

On the record before us, there is no question that Mrs. Nolan had authority to consent to a search of her son's bedroom. In arguing the motion to suppress before the trial court, counsel for the defendant

maintained that *People v. Nunn* (1973), 55 Ill. 2d 344, 304 N.E.2d 81, was dispositive. *Nunn*, however, is clearly distinguishable. In *Nunn*, the supreme court, three justices dissenting, upheld the suppression of evidence obtained during a warrantless search of the defendant's room in his parents' house to which his parents "consented." Unlike the case at bar, Nunn had moved out of the room 10 to 14 days prior to the search, had locked the door, and had instructed his mother that no one was to enter. In the case at bar, defendant testified that he did not lock the door to his room, and that he had not instructed his parents to keep anyone out. In fact, he acknowledged that his parents had access to his room.

■■ The trial court suppressed the evidence, concluding that Mrs. Nolan had not consented to the search, but had merely acceded to the demands of the police to conduct a search. In reaching this conclusion, the trial court relied solely on the subjective factors attendant to Mrs. Nolan's demeanor on the witness stand. Such factors, by their nature, are not reflected in the record now before us. Nor can they be considered as a true reflection of Mrs. Nolan's state of mind, some months before, in her own home in the presence of her husband. Aside from the trial court's subjective analysis of Mrs. Nolan's state of mind during the search, the record reflects only that Mrs. Nolan was calm and cooperative during the search. In short, there is nothing in the record to support the trial court's conclusion that Mrs. Nolan did not freely consent to the search of her son's room. Given the state of this record, the conclusion of the trial court was unreasonable. Accordingly, that portion of the trial court's order which suppressed the physical evidence seized from defendant's bedroom is reversed.

Affirmed in part; reversed in part.

STAMOS, P. J., and McGLOON, J., concur.