UNITED STATES of America,
Appellee,

v.

Howard M. BRONSTEIN and Douglas
P. Pennington, Appellants.

Nos. 1184, 1194, Dockets 75–1124,
75–1125.

United States Court of Appeals,
Second Circuit.

Argued June 27, 1975.

Decided Aug. 8, 1975.

Thomas P. Smith, Asst. U. S. Atty., D. Conn. (Peter C. Dorsey, U. S. Atty., D. Conn.), for appellee.

Aaron P. Slitt, Stephen McEleney, Hartford, Conn., for appellants.

Before CLARK, Associate Justice,* MANSFIELD and MULLIGAN, Circuit Judges.

MULLIGAN, Circuit Judge:

This is an appeal from a decision of Hon. T. Emmet Clarie, *Chief Judge,* United States District Court for the District of Connecticut, rendered on November 5, 1974, denying appellants' motion to suppress some 240 pounds of marijuana seized in a warrantless search at Bradley International Airport on July 6, 1974. The appellants, Howard Bronstein and Douglas Pennington, were indicted

* United States Supreme Court, retired, sitting by designation.

by a grand jury sitting in Hartford, Connecticut on July 19, 1974 on a single count of possession with the intent to distribute the marijuana in violation of 21 U.S.C. §§ 812 and 841(a)(1). On January 9, 1975 both appellants pleaded guilty, reserving the right to appeal the denial of the suppression motion.[1]

I

On Saturday morning, July 6, 1974, two men purchased tickets for American Airlines Flight No. 10 from San Diego, California to Bradley International Airport in Windsor, Connecticut. The men's behavior attracted the attention of two ticket agents who alerted a Special Agent of the Drug Enforcement Administration (DEA). Each carried two new large suitcases all of about the same size, shape and weight and all equipped with combination locks. Although they did not purchase their tickets together and appeared to act as strangers to each other, they were later seen by the ticket agents to be talking together like old friends. The DEA agent, who had previous experience with the ticket agents and found them to be reliable informants, telephoned the Hartford, Connecticut office of DEA alerting it to the suspicions of the airline personnel. In addition to providing a full personal description of the men and their luggage, he also stated that their tickets had been purchased under the names B. Drake and H. Braun. The DEA in Hartford in turn advised the Connecticut State Police unit at Bradley field which had a German Shepherd, "Meisha", which was trained to detect marijuana. When Flight 10 arrived at the airport in Connecticut, the luggage was removed by carts to the baggage area where it was to be picked up by the passengers. About 50 pieces of luggage were lined up on the conveyor belt which was not moved until Meisha, the canine cannabis

connoisseur, was given the opportunity to walk along the row of baggage, sniffing at the bags. Meisha reacted positively, i. e., sniffed vigorously and nipped and bit, at only two pieces of luggage, both new, about the same size and equipped with combination locks. While a state trooper and a DEA agent were occupied in observing Meisha, other DEA agents observed two men in the area where the passengers pick up luggage. They were the only two men fitting the description which had been received from California and each was observed picking up one of the bags identified by Meisha as well as another bag of comparable size with a combination lock.

Pennington was approached by agents who asked if he was "B. Drake" and if the luggage he was carrying belonged to him. When Pennington made these admissions, he was placed under arrest. Bronstein had walked to the rent-a-car parking area before agents intercepted him and asked if he was "H. Braun" and if he owned the baggage he was carrying. Upon his admissions, Bronstein was asked to proceed with the agents to the state trooper office in the terminal where he was also placed under arrest.

After their arrest both defendants were advised of their rights and stated that they did not wish to make any statement until they had consulted with a lawyer. Both indicated their desire to leave as quickly as possible and asked the agents what procedure would have to be followed to obtain their release. They were advised that an affidavit would have to be prepared and a United States Magistrate located before a search warrant could issue. He would then arraign them and set bail. They were also advised that if they wanted to give permission to open the bags, this would save time. The appellants then asked if they could speak privately. The agents left the room and the two men

---

1. This procedure was consented to by the Government with the approval of the District Court. This court has also approved the practice in the past. E. g., *United States v. Burke,* 517 F.2d 377, 378-379 (2d Cir., 1975); *United*

States v. Faruolo, 506 F.2d 490, 491 n. 2 (2d Cir. 1974). The appellants were both sentenced to four months' imprisonment and two years' probation.

conferred together for about 15 minutes. They then agreed to open the bags if the agents would be willing to recommend a non-surety bond or a release without bond and the agents agreed. Judge Clarie found that the bond discussion was initiated by the appellants, and that there was no physical force, verbal abuse or guns drawn by the agents. He concluded: "Defendants freely and voluntarily consented to a search of their four suitcases . . . ."

The agents opened the 4 pieces of luggage and each contained about 60 pounds of marijuana as well as moth balls, apparently utilized to disguise the marijuana odor. The appellants were then arraigned and released on personal recognizance, non-surety bonds.

## II

The appellants' first contention is that the law enforcement officers' action which we have described constituted a warrantless search and seizure "without probable cause in the use of a trained German Shepherd dog." Appellants' argument here hinges upon the proposition that the sniffing, nipping and biting at the luggage by Meisha at the airport was a search within the protection of the Fourth Amendment. This contention, apparently made for the first time to a district court in this circuit, was described as "nonsense" below and termed "frivolous" by the District of Columbia Circuit in *United States v. Fulero,* 498 F.2d 748 (1974). In that brief opinion it appears that another marijuana detecting dog, "Chief," had sniffed the air around a busline terminal locker room and had discovered the presence of the drug in a footlocker. The court found ample probable cause for the issuance of a search warrant and characterized the conduct of the police as "a model of intelligent and responsible procedure."[2]

In view of the tip received from the airline-employee informants previously found to be reliable by the West Coast DEA agent, who in turn alerted the Connecticut officers here, there was ample cause for the agents to pursue the lead and to place under surveillance the fully described passengers and their luggage. See *United States v. Ventresca,* 380 U.S. 102, 111, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965); *United States v. Sultan,* 463 F.2d 1066, 1069 (2d Cir. 1972). It is well understood that marijuana, like hashish, has an offensive and pungent aroma. See *United States v. Falley,* 489 F.2d 33, 37–38 (2d Cir. 1973). The danger of the detection of the drug by reason of its odor undoubtedly was the reason for packing the moth balls in the luggage. If the police officers here had detected the aroma of the drug through their own olfactory senses, there could be no serious contention that their sniffing in the area of the bags would be tantamount to an unlawful search. *United States v. Johnston,* 497 F.2d 397, 398 (9th Cir.); *United States v. Martinez-Miramontes,* 494 F.2d 808, 810 (9th Cir. 1974), cert. denied, 419 U.S. 897, 95 S.Ct. 176, 42 L.Ed.2d 141 (1974); *United States v. Halliday,* 487 F.2d 1215, 1217 (5th Cir. 1973). We fail to understand how the detection of the odoriferous drug by the use of the sensitive and schooled canine senses here employed alters the situation and renders the police procedure constitutionally suspect.

Since the dogs have not yet at least been trained to talk, their response to the presence of the drug is conveyed by nosing along the seams of the bags where they would open and then nipping and biting at the bags. This biting did not expose the contents of the bag and while it may well have constituted a technical trespass, see *United States v. Artieri,* 491 F.2d 440, 445–46 (2d Cir.),

**2.** In *United States v. Solis,* 393 F.Supp. 325 (D.C.Cal., 1975), it was held that the use of marijuana-detecting dogs constituted a search per se under the Fourth Amendment. Aside from the fact that this case is not binding upon us, we note that the dogs in *Solis* sniffed at a closed trailer, which the court held to be a "private place" where there was a reasonable expectation of privacy. Moreover, the dogs were employed in response to a tip from an informer of unproven reliability.

cert. denied, 417 U.S. 949, 95 S.Ct. 142, 42 L.Ed.2d 118 (1974), it cannot be sensibly characterized as a search or seizure. The canine surveillance conducted here occurred in a public airline terminal and the subject was baggage shipped on a public air flight. There can be no reasonable expectation of privacy when one transports baggage by plane, particularly today when the menace to public safety by the skyjacker and the passage of dangerous or hazardous freight compels continuing scrutiny of passengers and their impedimenta. See *United States v. Edwards,* 498 F.2d 496, 500 (2d Cir. 1974); see also *Air Line Pilots Ass'n, Int'l. v. CAB,* 516 F.2d 1269 (2d Cir. 1975). "What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection." *Katz v. United States,* 389 U.S. 347, 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967); and see *United States v. Johnston, supra,* 497 F.2d at 398.

We cannot agree with the contention that the police are limited to the resources of their physical senses and that the use of scientific or, in this case, canine assistance in pursuit of the criminal is impermissible. The law is settled contrariwise.[3] The appellants here rely however upon *United States v. Albarado,* 495 F.2d 799, 802–03 (2d Cir. 1974), where Judge Oakes characterized the magnetometer airport search process as a search within the protection of the Fourth Amendment. (Cf. *United States v. Bell,* 464 F.2d 667, 673 (2d Cir.), cert. denied, 409 U.S. 991, 93 S.Ct. 335, 34

L.Ed.2d 258 (1972) ). We think that the use of Meisha and the magnetometer are clearly distinguishable.

Every passenger boarding a plane and his carry-on luggage are required to pass through the electronic devices which we have had occasion to describe in previous opinions in this court (*e. g., United States v. Edwards, supra; United States v. Albarado, supra; United States v. Bell, supra.*) Since the magnetometer is so calibrated that it can be activated by any sufficient quantity of metal, the air traveller in up to fifty per cent of the inspections will set it off, *United States v. Lopez,* 328 F.Supp. 1077, 1086 (E.D.N.Y.1971), and thus may well be subjected to a search of his person or his baggage because they contain such innocuous objects as lockets, key chains, combs or coins. Although the search may be justified by the possibility that the passenger is carrying weapons or explosives which may pose a danger to flight, the fact is that when a passenger has been apprehended as the result of the search, usually the reason for his arrest has been his possession of narcotics.[4] The concern of the *Albarado* panel expressed in Judge Oakes's opinion focused on the magnetometer as a sweeping metal-detecting device brought into action against all passengers without probable cause in any particular case. Moreover "it [the magnetometer] searches for and discloses metal items within areas most intimate to the person where there is a normal expectation of privacy," 495 F.2d at 803.[5]

---

**3.** It has often been held that the use of certain "sense-enhancing" instruments to aid in the detection of contraband, etc., does not constitute an impermissible Fourth Amendment search. E.g., *United States v. Lee,* 274 U.S. 559, 563, 47 S.Ct. 746, 71 L.Ed. 1202 (1927) (opinion of Brandeis, *J.*) (use of boat searchlight is "not prohibited by the Constitution."); *United States v. Hood,* 493 F.2d 677, 680 (9th Cir.), cert. denied, 419 U.S. 852, 95 S.Ct. 852, 42 L.Ed.2d 84 (1974) (flashlight used to look into car at night "did not constitute a search . . . ."); *United States v. Minton,* 488 F.2d 37, 38 (4th Cir. 1973), cert. denied, 416 U.S. 936, 94 S.Ct. 1936 (1974) (use of binoculars);

*Cobb v. Wyrick,* 379 F.Supp. 1287, 1292 n.3 (W.D.Mo.1974) (use of flashlight).

**4.** In fact a panel of this circuit has noted that, in the great majority of cases, arrests resulting from the use of anti-hijacking procedures have nothing to do with aircraft security, but instead involve other offenses, usually the possession of contraband. *United States v. Albarado, supra,* 495 F.2d at 805 & n. 12.

**5.** Subsequently, Judge Friendly in his *Edwards* opinion was able to distinguish *Albarado* on this ground. In *Edwards,* the defendant set off the magnetometer when she walked through it while carrying her baggage; only this baggage

The police dog sniffing procedure here, it seems to us, is distinguishable in kind and degree. The magnetometer search is indiscriminate and the presence of sufficient metal willy-nilly leads to the body or baggage search. Meisha by contrast was trained only to detect marijuana which is contraband and its possession a criminal offense. Appellants claim that Meisha was only fifty per cent accurate since she missed two of the bags; in contrast, the Government points out that her record is perfect because in this case and in previous performances, she has never reacted positively to baggage which did not contain cannabis. The issue is not how we compute Meisha's track record but rather that unlike the magnetometer, Meisha responds only to marijuana. To the extent that moth balls or other substances may be utilized to camouflage the scent, she may be in error but her mistake favors the suspect and precludes search and subsequent arrest. In sum, the intrusion is much more restricted and was aimed not at the person but his baggage which leaked the telltale aroma. Moreover Meisha was not employed in a dragnet operation directed against all flight passengers but rather on the basis of reliable information that reasonably triggered the surveillance employed here. While the prospect of widespread police use of highly developed scientific equipment invading the privacy of the populace unquestionably creates justifiable constitutional concern, we cannot reasonably consider Meisha under the circumstances revealed on the record before us to pose any such threat. The police have traditionally employed dogs to detect crime and criminals and the limited but effective use of the animal here creates no constitutional issue of substance. We find no search or seizure violative of the Fourth Amendment and ample probable cause to make the arrest of the appellants here.

## III

Appellants' second proposition, that their consent to the search of their bags was not voluntary but was coerced, is not substantial. The argument is that their repeated requests for counsel were ignored and that they were threatened with a punitive arraignment and high bond if they did not agree to open the suitcases. The District Court here conducted a two-day hearing at which the agents involved as well as the defendants testified. Chief Judge Clarie had the opportunity to observe personally the demeanor of the witnesses and to gauge their credibility. His findings of fact, referred to supra, are detailed and are not "clearly erroneous," *United States v. Boston,* 508 F.2d 1171, 1179 (2d Cir. 1974). While the agents here did recommend a non-surety bond as they agreed to, there was testimony that this bargain was initiated by the appellants and not the agents. Moreover, testimony showed that both defendants were advised that they did not have to make any statement without consulting counsel. There was no demand for immediate counsel; no intensive questioning, and no force or threat of force, were employed. While there was a conflict in the testimonies of the agents and the defendants, Judge Clarie credited the agents' testimony and there is nothing in the transcript which would indicate that his judgment was erroneous. Both appellants appeared to be intelligent and articulate,[6] and understood what was going on. The determination of the question of volitional consent to a search is a question of fact which depends upon the "totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041,

---

was then searched, and heroin was found in one of her bags. Hence, "the case presents no such questions concerning a search of her person as were considered in *Albarado.*" 498 F.2d at 500. Of course, we here also have a search of baggage and not a personal search.

**6.** Bronstein is a college graduate; Pennington attended Arizona State University for over three and one-half years.

36 L.Ed.2d 854 (1973); *United States v. Faruolo,* 506 F.2d 490, 493 (2d Cir. 1974). This was the test correctly applied by the court below.

Affirmed.

MANSFIELD, Circuit Judge (concurring):

Although I concur in the result reached by the majority, I do so by a somewhat different route.

I am unable to agree with the majority that use of a marijuana-sniffing dog to ascertain the contents of a private bag amounts to some sort of "plain smell," comparable to a "plain view," *Coolidge v. New Hampshire,* 403 U.S. 443, 465–68, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971), rather than a search. The essence of a search is the intrusion into an area (whether it be a bag or a room) which the owner or possessor is entitled to enjoy as private. As the majority recognizes, there is no such intrusion when a human being can, with his own senses and without physical investigation, ascertain the contents. And, even though it is stretching the rule somewhat, the police have been permitted to enhance or magnify the human senses with the aid of instruments such as binoculars or flashlights, see cases cited in majority note 3, *supra.* But that is not the case here where the "nose" being put into others' business was clearly an intrusion. The police agents here did not smell or see any contraband, nor were their senses enhanced. Their only indication that marijuana was present was the action of the dog. Their own senses were replaced by the more sensitive nose of the dog in the same manner that a police officer's ears are replaced by a hidden microphone in areas where he could not otherwise hear because of the inaudibility of the sounds. The illegality of the latter practice in the absence of a search warrant or special circumstances has long been established. E. g., *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

There is no legally significant difference between the use of an X-ray machine or magnetometer to invade a closed area in order to detect the presence of a metal pistol or knife, which we have held to be a search, *United States v. Albarado,* 495 F.2d 799, 802–03 (2d Cir. 1974), and the use of a dog to sniff for marijuana inside a private bag. Each is a non-human means of detecting the contents of a closed area without physically entering into it. The magnetometer ascertains whether there is metal in the hidden space by detecting changes in the magnetic fields surrounding the area of the hidden space. The dog uses its extremely sensitive olfactory nerve to determine whether there are marijuana molecules emanating from the hidden space. Neither constitutes a particularly offensive intrusion, such as ransacking the contents of the hidden space, or exposing a person to indignities in the case of a personal search. But the fact remains that each detects hidden objects without actual entry and without the enhancement of human senses. The fact that the canine's search is more particularized and discriminate than that of the magnetometer is not a basis for a legal distinction. The important factor is not the relative accuracy of the sensing device but the fact of the intrusion into a closed area otherwise hidden from human view, which is the hallmark of any search. If, as we have held, examination of carry-on luggage and individual passengers by a magnetometer or X-ray machine amounts to a search within the prohibition of the Fourth Amendment because it discloses hidden items within areas where there is a normal expectation of privacy, *United States v. Albarado, supra,* 495 F.2d at 802–03, then the intrusion of a sniffing dog in search of marijuana must also fall within that prohibition when directed at hidden areas where there is similarly a normal expectation of privacy.

Setting aside the expectation of privacy issue for a moment, the circumstances justifying a warrantless search of boarding passengers and their hand luggage are not present here. We have upheld warrantless magnetometer searches against Fourth Amendment attack, at

least where advance notice has been given, on the ground that they represent a minimal intrusion that is necessary and reasonable to protect against the danger to life and property threatened by possible skyjacking. See *United States v. Edwards,* 498 F.2d 496 (2d Cir. 1974); *United States v. Albarado, supra.* Here the contraband being sought presents no danger to the passengers or to the airplane itself. Moreover, the baggage was searched after the plane had arrived at its destination and the baggage had been unloaded.

The question, therefore, is whether the dog-search can be upheld on other grounds or whether it penetrated an area as to which there is a normal or justifiable expectation of privacy and thus violated the Fourth Amendment. Surely the use of a dog to sniff an alighting passenger or passerby for the purpose of determining the presence of marijuana on his person would not be permitted any more than would be the use of a sophisticated detection device to search his person for contraband. However, one who consigns luggage to the common baggage area of a public carrier, airport or similar facility cannot expect to enjoy as much privacy with respect to the bag as he would with respect to his person or property carried by him personally into, on or from the carrier or facility. It is common knowledge that luggage turned over to a public carrier will be handled by many persons who, although not permitted to open it without the owner's permission, may feel it, weigh it, check its locks, straps and seams to insure that it will not fall apart in transit, and shake it to determine whether the contents are fragile or dangerous. See *United States v. Johnston,* 497 F.2d 397 (9th Cir. 1974).

Since a person's expectation of privacy with respect to his baggage declines as the anticipated public access to the baggage increases, it is not unreasonable, where the police have reasonable grounds to suspect the presence of contraband, to permit use of an external method or device to determine whether the baggage contains contraband. On this ground I would uphold the search here. However, I would strictly limit such a search to cases where there are grounds for such suspicion, similar to or stronger than that present here, and would not permit a wholesale examination of all baggage in the hope that a crime might be detected. Otherwise, as the majority recognizes, the spectre of a "Big Brother" baggage search, uncurbed by the Fourth Amendment, would then loom much larger on the horizon. As more sophisticated detection devices are developed in the future, such a broad authority would be an open invitation to conduct blanket examinations, thus eroding the principles underlying the Fourth Amendment itself.