THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, *v.* DANIEL CAMPBELL *et al.*, Defendants-Appellees.

First District (3rd Division) Nos. 61036-38 cons.

Opinion filed December 30, 1975.

McGLOON, P. J., specially concurring.

Bernard Carey, State's Attorney, of Chicago (Bertina E. Lampkin, Laurence J. Bolon, and John F. Brennan, Assistant State's Attorneys, of counsel), for the People.

Jerome Rotenberg and Lawrence P. Hickey, both of Chicago, for appellees.

Mr. JUSTICE DEMPSEY delivered the opinion of the court:

Daniel Campbell, Patrick Myers and Michael Ward were arrested for the possession of marijuana at O'Hare International Airport, Chicago, soon after their arrival on a commercial airline flight from San Antonio, Texas. Their luggage was searched, marijuana was found and they were charged with the knowing possession of the drug in violation of section 4 of the Cannabis Control Act (Ill. Rev. Stat. 1973, ch. 56½, par. 704). Prior to trial they filed separate motions to suppress the seized evidence. The State has appealed from the trial court's order granting such a motion. Ill. Rev. Stat. 1973, ch. 110A, par. 604(a)(1).

At the hearing on the motions, Dale Anderson, a special agent assigned to the Chicago office of the Federal Drug Enforcement Administration, testified that about 2 p.m., on February 27, 1974, he received a telephone

message from Agent Robinson of the administration's San Antonio office that three men suspected of having marijuana in their possession had boarded a plane for Chicago. Robertson gave Anderson the following background information: the San Antonio office had been informed by Agent Nichols of their El Paso office that Ward had been stopped at the Texas border after having entered the United States illegally from Mexico. Ward, who had been arrested previously in Brownsville, Texas, for possessing marijuana, had $2,700 on his person; upon questioning him it was learned that he planned to take a plane to Chicago and then go on to Michigan. Released, but kept under surveillance, Ward was next observed reentering Mexico. His name was placed on the United States Customs "look-out" system so that various law enforcement agencies would be alerted should he attempt to return. He was next seen at a bus station in El Paso in the company of two other men who were subsequently identified as the defendants Campbell and Myers. The men, with eight suitcases and a footlocker, boarded a bus bound for San Antonio. Upon their arrival in San Antonio they were kept under observation, and Robertson said they took Braniff flight #58 which was scheduled to arrive in Chicago at 4:30 p.m. that afternoon.

Anderson notified the Chicago Police Department that three men were coming to Chicago who were suspected of carrying marijuana in their luggage. Two dogs, trained in narcotics detection, were placed at Anderson's disposal by the department's Vice Control Unit. The dogs and their handlers were stationed in a nonpublic area in back of the Braniff Airlines' luggage retrieval conveyors at O'Hare. The luggage from flight #58 was brought to that area and the dogs were allowed to sniff all of it. Ward, Campbell and Myers had been observed disembarking from the plane, but neither Anderson, nor Donald Senece, the officer in charge of the vice control detail, nor the policemen handling the dogs, knew what suitcases belonged to them. Independent of each other, the dogs reacted vigorously to two suitcases—a reaction which their handlers told Anderson and Senece was caused by the scent of marijuana emanating from the suitcases.

All the luggage was then released. Campbell and Myers claimed nine pieces including the two suitcases the dogs had attacked. They loaded the baggage on two carts and wheeled them to an upper level of the airport where they met Ward. The three men then walked to a North Central Airlines ticket counter. As they were about to check the eight suitcases and the footlocker into North Central, they were arrested by Senece. The suitcases that had received the dogs' positive response, and which still bore traces of their saliva, were opened and searched. Mari-

juana was found in them, as it was in the remaining seven pieces of luggage when they were opened later at the headquarters of the Vice Control Unit.

■■■ Since the search of the two suitcases was made without a warrant, its validity can be sustained only if the arrests preceding it were legal. (*Chimel v. California* (1969), 395 U.S. 752, 23 L.Ed.2d 685, 89 S.Ct. 2034.) Two components must be considered in determining whether there was probable cause to arrest the defendants: the information the Chicago law enforcement authorities received from their counterparts in Texas and the information conveyed to them by the dogs' reaction to the suitcases. A warrantless arrest is proper if the arresting officer has reasonable grounds to believe that the person he is about to arrest has committed or is committing a criminal offense. (Ill. Rev. Stat. 1973, ch. 38, par. 107—2(c); *People v. Wright* (1969), 42 Ill.2d 457, 248 N.E.2d 78.) The reasonableness of the arrest must be determined by the knowledge and information possessed by the police officer at the time the arrest is made. (*People v. Clay* (1973), 55 Ill.2d 501, 304 N.E.2d 280.) The test is whether the facts and circumstances known to the officer warrant a prudent man in believing an offense has been committed. (*Henry v. United States* (1959), 361 U.S. 98, 4 L.Ed.2d 134, 80 S.Ct. 168.) An arrest cannot be based on mere suspicion (*People v. Marino* (1970), 44 Ill.2d 562, 256 N.E.2d 770), but in determining if probable cause exists courts deal with probabilities and act upon the factual and practical considerations of everyday life upon which reasonable and prudent men must act. (*Brinegar v. United States* (1949), 338 U.S. 160, 93 L.Ed. 1879, 69 S.Ct. 1302; *People v. Fiorito* (1960), 19 Ill.2d 246, 166 N.E.2d 606.) The factual basis for the arresting officer's belief that a crime has been or is being committed need not be as persuasive as that necessary for the conviction of a defendant for a crime. (*People v. Peak* (1963), 29 Ill.2d 343, 194 N.E.2d 322.) Reasonable grounds for an arrest may be supplied by an informer of established reliability. (*People v. Durr* (1963), 28 Ill.2d 308, 192 N.E.2d 379.) Apart from the question of its sufficiency, which will be discussed later, the information received by Anderson came from agents of the Federal Drug Enforcement Administration and the United States Border Patrol. The information was supplied by reliable sources and Anderson and Senece had good reason to rely upon it.

The probative value of the information they obtained by observing the dogs' reaction poses a more difficult problem. At the hearing on the motion to suppress it was stipulated that if the dogs' handlers were called as witnesses they would testify:

"* * * that these dogs are specially trained for the purpose of detecting narcotics * * * that their actions in the airport indicated to the handlers, based on their previous experiences with the dogs, that there was narcotics in the suitcases."

Despite this stipulation the defendants contend that the dogs' reliability was not established—they were alerted by only two suitcases although there was marijuana in all nine pieces of luggage; that the dogs could not be cross-examined, the testimony of their handlers was hearsay and there was no evidence as to the basis of their conclusion; that the defendants were thus deprived of their right to the confrontation of witnesses, the assessment of their credibility and the protection of cross-examination.

Because of their keen olfactory sense, dogs for many years have assisted police in tracing human beings and in the detection, pursuit and capture of criminals. With the present day increased traffic in narcotic drugs and the growing menace from their widespread use, dogs have been trained to recognize the scent of these drugs and have been used with much success in their detection. Judicial acceptance of this detection in the determination of probable cause has been mixed. Illinois appellate courts have not passed on this question directly and courts of other jurisdictions have expressed divergent views.

This is illustrated by the following cases. In *United States v. Fulero* (D.C. Cir. 1974), 498 F.2d 748, an employee at a bus station in Arizona notified the local police of the suspicious actions of three men who were shipping two footlockers to Washington, D.C. An officer went to the station and examined the lockers. He smelled the odor of mothballs which he knew was frequently used to conceal the odor of marijuana. He obtained the services of a dog handler and a marijuana-sniffing dog from the Federal Customs Service. The handler brought the dog into the baggage room where there were several pieces of luggage. The dog went immediately to one of the footlockers; he was pulled away, but he returned three times, pawed at it and attempted to chew it. The officer obtained a search warrant, opened the lockers and found 88 pounds of marijuana. The defendant, Fulero, was arrested when he reclaimed the luggage in Washington. He was found guilty of the unlawful possession of marijuana and he appealed, contending that having the dog sniff at his footlockers was an unconstitutional intrusion into them and that there was no probable cause for the issuance of the warrant. The reviewing court called the intrusion argument frivolous, held there was ample probable cause for issuing the warrant and said that the conduct of the police was a model of intelligent procedure.

In contrast, the court in the case of *United States v. Solis* (C.D. Calif. 1975), 393 F.Supp. 325, held that the positive reaction of two trained

United States Customs' dogs to the scent of marijuana coming from the inside of a semi-trailer did not establish probable cause for the search of the trailer. Before conducting the search, the government agents had obtained a warrant which had been issued upon information supplied by an informer and had employed two dogs said to be 100 percent reliable in detecting narcotic substances. The court, characterizing the case as one involving the "uninvited canine nose," held the search warrant was defective because the informer was of unproven reliability and that consequently the warrantless search, based as it was entirely on the dogs' reaction, was invalid. In its opinion the court stated that the owner of the fully enclosed trailer had a reasonable expectation that the interior of the vehicle, even though parked at a gasoline station accessible to the public, would be treated as a private place. The court concluded that by employing the olfactory senses of the dogs, the agents gained information substantially equivalent to what they would have acquired had they actually opened the doors and examined the trailer's concealed interior and that this constituted an unreasonable search under the Fourth Amendment.

A dog was also used in the case of *United States v. Bronstein* (2d Cir. 1975), 521 F.2d 459. In *Bronstein* the court affirmed the denial of a motion to suppress marijuana which was detected in the defendants' suitcases by a marijuana-sniffing police dog. The warrantless search of the suitcases occurred at a Connecticut airport where the two defendants arrived after a flight from California. The defendants' behavior at the California airport attracted the attention of ticket agents who alerted an agent of the Federal Drug Enforcement Administration. The agent had previous experience with the ticket agents and had found them to be reliable informants. The agent relayed the ticket agents' suspicion and the description of the men and their luggage to his Connecticut office. The State police of Connecticut were notified and they, government agents and a trained dog were at the airport when the California flight arrived. Fifty pieces of luggage from the flight were lined up on a conveyor belt which was not moved into the public retrieving area until the dog, termed by the court a "canine cannabis connoisseur," was given the opportunity of sniffing the baggage. The dog vigorously nipped at two suitcases. When the baggage reached the public area two men, who fitted the descriptions received from California, picked up two suitcases each, including one of those identified by the dog. Each man was arrested after he admitted the suitcases he was carrying belonged to him. After some discussion the men agreed to open the bags. Each one of the four bags was found to contain 60 pounds of marijuana, packed in a quantity

of mothballs, designed, the court said, to disguise the "pungent and offensive aroma" of the marijuana. The defendants' motion to suppress the evidence was denied. In affirming the denial, the reviewing court noted that there can be no reasonable expectation of privacy when one transports baggage by airplane, stated that the sniffing of the dog was not a search within the meaning of the Fourth Amendment, and held that the use of the dog by agents who had ample reason to pursue the reliable information they had received from California did not render the subsequent search constitutionally suspect. The court concluded that there was probable cause to arrest the defendants and that the search of their suitcases and the seizure of the marijuana did not violate the Fourth Amendment.

There are many similarities between the *Bronstein* case and the present one. The dog in *Bronstein,* like those in this case, did not react to all the suitcases that contained contraband. In *Bronstein,* the marijuana was packed in mothballs, here it was wrapped in small bags surrounded with talcum powder. In both cases the defendants were arrested at airports after arriving from distant States and their arrival was preceded by information received from narcotics agents in those States. However, the information received by the Federal agent in Chicago was much more incriminating than that received by the agent in Connecticut. The latter's information came from a fellow agent, but it rested on the suspicions of airline employees aroused by the actions of the defendants in the California airport and their having four identical pieces of new luggage. The Chicago agent's information came from his associates whose own suspicions were aroused by Ward's prior arrest for the possession of marijuana, by the large amount of cash on his person, his illegal entry into the United States from Mexico and his surreptitious trips in and out of that country.

■■■ Although the information came from trustworthy sources, it was not sufficient, by itself, to justify an arrest. However, it was sufficient to arouse a strong suspicion that a crime was being committed and was sufficient to justify the use of the trained dogs to confirm or remove the suspicion. The defendants were not arrested because of this information, nor were they arrested just because of the dogs' positive reaction to the defendants' luggage. They were arrested because of the information the Federal agent and the Chicago policeman had of the suspicious nature of Ward's activities and because of the confirmation of this suspicion by the reaction of the dogs. Absent either factor, Anderson and Senece did not have probable cause to make an arrest, but the combination of both factors—the information possessed by them and the affirmative response

of the trained dogs—established probable cause for arrest.

■■ At this juncture we must differentiate between the defendants. Although there was probable cause to arrest Ward, there was none to arrest Campbell and Myers. The information concerning them was inadequate to justify the use of the dogs or to validate the knowledge acquired from the dogs' behavior. The information received by Anderson inculpated Ward, not Campbell and Myers. The only thing learned about these men before they arrived at O'Hare was that they accompanied Ward from El Paso to San Antonio and that they were with him on a plane bound for Chicago. This would hardly provide a reasonable basis for concluding that they possessed marijuana. Mere presence at the commission of a crime does not constitute culpability (*People v. Bracken* (1966), 68 Ill.App.2d 466, 216 N.E.2d 176) and associating with a person known to have, or reasonably suspected of having, possession of narcotics is insufficient in and of itself to constitute probable cause for an arrest. (*Sibron v. New York* (1968), 392 U.S. 40, 20 L.Ed.2d 917, 88 S.Ct. 1889.) Guilt by association is a thoroughly discredited doctrine. (*Uphaus v. Wyman* (1959), 360 U.S. 72, 3 L.Ed.2d 1090, 79 S.Ct. 1040; *People v. Ramirez* (1968), 93 Ill.App.2d 404, 236 N.E.2d 284.) The only additional thing learned about Campbell and Myers after they arrived at O'Hare was that they retrieved all the luggage including the two suitcases attacked by the dogs. But this additional information was insufficient to reasonably establish that they knew what was in the suitcases. There was no indication that the suitcases belonged to them and it is not unusual for traveling companions to take care of another's bags.

At the time of the arrest, the authorities had no valid information to support their suspicion that Campbell and Myers possessed marijuana themselves, or that they had attached themselves to Ward with knowledge of his criminal design or that they shared with him a common purpose to commit an illegal act. Although subsequent events disclosed their complicity, this was not apparent at the time of their arrest. There was not probable cause for their arrest and the search of any luggage they may have owned was improper.

■■ We use the words "any luggage they may have owned" advisedly, for there was no evidence of any kind as to whose luggage was opened. Based on the report received from Texas and the reaction of the dogs there was substantial reason to believe that Ward's luggage contained contraband and, consequently, there was probable cause for his arrest and the concomitant search of his luggage. However, there was no proof that the two suitcases which were searched belonged to him. For all the record shows, they may have been owned by Campbell or Myers.

While the logical supposition would be that some of the luggage was Ward's, it would also be logical to presume, since he was traveling with two companions, that not all of it was his. We have mentioned the similarities between this case and *United States v. Bronstein* (2d Cir. 1975), 521 F.2d 459; there is however, one crucial difference: in *Bronstein* there was no problem matching the defendants with their luggage since each admitted when questioned by the police that he owned one of the suspected suitcases. Here, neither Ward, nor Campbell and Myers made such an admission, nor were they asked before being arrested who owned the suitcases marked by the dogs. It is the absence of this connecting link—knowledge on the part of the arresting officers concerning the ownership and control of the bags—that impels affirmance of the trial court's decision.

■■ There was no probable cause to arrest Campbell and Myers and hence the search of any luggage owned or controlled by them was an unjustifiable invasion of their right of privacy. The order of the trial court sustaining their motions to suppress the evidence was correct and it is affirmed. There was probable cause to arrest Ward and a search of his luggage incident to his arrest was proper, but inasmuch as there is no evidence whatsoever in the record that either of the opened suitcases was his property or that he clearly exercised dominion and control over either one of them, the order sustaining his motion to suppress was correct and is affirmed.

Judgment affirmed.

McNAMARA, J., concurs.

Mr. PRESIDING JUSTICE McGLOON, specially concurring:

I agree with the majority's decision to affirm the order of the circuit court of Cook County suppressing the seized evidence, but would follow a different mode of analysis on the question of whether there was probable cause to arrest Ward.

The majority's opinion stands for the proposition of law that a trained dog's alert for narcotics is not a search within the meaning of the fourth amendment and that such a canine alert may be used to establish probable cause for a lawful arrest with the subsequent search and seizure. In my opinion, whenever a trained dog is directed to and sniffs the air adjacent to a closed suitcase to discover concealed contraband contents which are not ascertainable to a human using his natural powers of perception, a constitutionally impermissible search of the suitcase has been made by the dog's policeman handler.

The State argues that the odor the dogs sniffed was a chemical vapor which had emanated from defendants' luggage and was readily accessible to anyone who could smell it. Otherwise worded, the contents of the suitcases were in "plain smell," a variation of the plain view doctrine, so that the defendants had no reasonable expectation of privacy as to the escaping odors. The majority fails to directly address itself to this argument. I believe that whenever an individual successfully conceals the sight and odor of any item from unaided human sensory perception, that individual reasonably anticipates his privacy under the fourth amendment. This concept can be explained by reference to the landmark case of *Katz v. United States* (1967), 389 U.S. 347, 19 L.Ed.2d 576, 88 S.Ct. 507, wherein the court held that the defendant overheard talking on the phone in a public telephone booth had a reasonable expectation of privacy. In that case, the police overheard the conversation via a microphone attached to the phone booth, and the listening was deemed to have been a search even though there was not a physical trespass, since the fourth amendment protects persons and not places. In the instant case, the defendants reasonably expected privacy for the contents of their suitcases, and when the dogs' handlers observed the dogs' reaction at the alert, there was a search of the suitcases and a discovery of the illicit contents therein. As was held in *United States v. Davis* (9th Cir. 1973), 482 F.2d 893, 905, it is sufficient that the defendants relied upon the closed suitcases for privacy.

The majority's reliance upon the decision in *United States v. Bronstein* (2d Cir. 1975), 521 F.2d 459, 462, indicates that the majority of this court implicitly adopts the Second Circuit's view that:

> "There can be no reasonable expectation of privacy when one transports baggage by plane, particularly today when the menace to public safety by the skyjacker and the passage of dangerous or hazardous freight compels continuing scrutiny of passengers and their impedimenta."

I believe that such a rule is incorrect when applied to the facts at bar. Individuals travelling by airplane are subject to certain limited searches for *weapons and explosives*. If a valid search for weapons and explosives discloses narcotics, the narcotics are considered to be disclosed pursuant to a lawful search. To search only for well-concealed narcotics and then attempt to justify the search under the need for the safety of airline passengers and baggage is in my judgment a misapplication of the law. I believe that the above rule enunciated in *Bronstein* and implicitly adopted by this court, without limitation and extended to its obvious, logical conclusion, would give *carte blanche* to a police officer with

suspicion to intentionally open any item of checked baggage and subject it to a general search.

The issue of consent is closely related to the issue of reasonable expectation of privacy. When an individual travels by air, he is subjected to an unobtrusive magnetometer scan for an amount of metal corresponding to that of a pistol or another metal weapon, and then a frisk for weapons if it is suspected that he is carrying a weapon. Some courts have held that an individual voluntarily passing through a clearly marked magnetometer inspection station consents to a search. Even if this rule is correct, I fail to see how express or implied consent to a *preflight* search of an individual and his hand luggage for concealed skyjacking weapons can be equated with consent to a *post-flight* search for narcotics.

In summary to this point, I believe that the use of the dogs to sniff around the luggage was a search of defendants' suitcases without either probable cause, a lawful arrest, a warrant, or consent. The State argues that the minimal intrusion by the investigating officers aided by specially trained animals is constitutionally permissible. To be sure, the use of dogs of unerring talent to sniff out concealed narcotics is a narrow search, as opposed to a general search. A narrow, unobtrusive search may, nonetheless, be violative of the fourth amendment.

The fourth amendment proscribes unreasonable searches without probable cause, and some carefully limited searches without probable cause have been held reasonable. The most widely recognized reasonable search upon less than probable cause is the stop and frisk procedure described in *Terry v. Ohio* (1968) 392 U.S. 1, 20 L.Ed.2d 889, 88 S.Ct. 1868, *People v. Lee* (1971) 48 Ill.2d 272, and sections 107—14 and 108—1.01 of the Code of Criminal Procedure (Ill. Rev. Stat. 1973, ch. 38, pars. 107—14 and 108—1.01), which permit "a carefully limited search of the outer clothing of such person" for weapons. (*Terry* at 30.) The court in *People v. Felton* (1974), 20 Ill.App.3d 103, 106, recently explained the three restrictions upon stop and frisk:

> "(1) the stop itself must be justified by specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant that intrusion; (2) assuming a valid stop, a limited search of the suspect for weapons is justified only if a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger; and (3) the authorized search is confined in scope to an intrusion reasonably designed to discover objects capable of use as weapons."

Upon similar grounds, an unobtrusive preflight magnetometer scan has been held to be the type of limited warrantless search approved in *Terry*. I believe that the language and holding in *United States v. Epperson* (4th Cir. 1972), 454 F.2d 769, 770, are illustrative:

"We agree that the use of the magnetometer in these circumstances was a 'search' within the meaning of the Fourth Amendment. By this device a government officer, without permission, discerned metal on Epperson's person. That he did so electronically rather than by patting down his outer clothing or 'frisking' may make the search more tolerable and less offensive—but it is still a search. Indeed, that is the very purpose and function of a magnetometer: to search for metal and disclose its presence in areas where there is a normal expectation of privacy.

We also agree that the limited search by magnetometer does not fall within any of the recognized exceptions to warrant requirement of the Fourth Amendment except that suggested by *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We think that case controls this one, although the reason in *Terry* for dispensing with the ordinary warrant requirement is not the same as here."

The court went on to state, as in *Terry* and numerous other cases, that the reasonableness of any warrantless search must be determined by balancing the governmental interest in searching against the invasion of privacy which the search entails. "These interests must be balanced at two stages: the search must be 'justified at its inception' and 'reasonably related in scope to the circumstances which justified the interference in the first place.'" (*Epperson* at 771, quoting from *Terry* at 20.) The court found that the governmental interest was the protection of essential air commerce and the lives of passengers, and that the limited magnetometer search was reasonably related to the prevention of skyjacking.

I would suggest in airport search cases that warrantless searches without probable cause are constitutionally permissible only when the protection of human life from danger is at stake. In the stop and frisk cases, the courts always stress that the limited search is permissible only if the policeman reasonably believes that he or another is in danger of attack. Similarly, the airport search cases without exception indicate that the overwhelming need for such searches is the protection of human life.

In the case at bar, I perceive no imminent danger to life or property as would justify a constitutionally permissible search. Nobody's life was in danger when the police officers led the trained dogs through the baggage area. Nobody's property was threatened with imminent destruc-

208

tion when the police, acting upon mere suspicion, searched by smell the baggage of the lawbreakers and lawabiding alike. Without a valid governmental interest to be balanced against the invasion of privacy, I cannot condone any search, however unobtrusive. Although the apprehension of drug sellers is an important governmental function, it does not rise to the level of protection of human life from attack, and I would hold that a search for drugs by police using trained dogs, based upon an articulable suspicion falling short of probable cause, is prohibited by the fourth amendment.

Since the use of trained dogs to detect concealed narcotics is undeniably a search, I would point out once again that the police herein searched every single piece of baggage unloaded from flight # 58. Although all but two pieces of baggage passed the search without alert by the dogs, the fact remains that the bags of innocent persons were unlawfully searched, albeit unobtrusively. Lest we face the terror of constant unobtrusive electronic searches of our persons, homes, and offices without probable cause, I would hold that the use of the trained dogs in the instant case was reprehensible. Although such dogs are invaluable to the Customs Service at border searches, where a lesser standard under the fourth amendment applies (*United States v. Beck* (3d Cir. 1973), 483 F.2d 203; *Alexander v. United States* (9th Cir. 1966), 362 F.2d 379), the domestic use of such dogs should be avoided unless there has already been a lawful arrest or a search warrant.